## JUSTESEN v. OLSEN et al.

No. 5289.   Decided January 10, 1935.   (40 P. [2d] 802.)

*A. W. Jensen* and *Udell R. Jensen,* both of Ephraim, for appellants.

*Lewis Larson,* of Manti, for respondent.

BATES, District Judge.

This action involves the right to the use of waters of an artesian basin situate in Sanpete county, Utah. The court's findings, based on the pleadings and sufficient evidence, set out: That plaintiff's land, consisting of 127 acres, was segregated from the public domain in the year 1883; that the

defendants' land, consisting of 527 acres situated immediately to the north of plaintiff's land, was segregated from the public domain in different parcels between the years 1873 and 1901. That there has been on plaintiff's land since the time when the memory of man runneth not to the contrary some small springs, and that in the year 1889, plaintiff drove six wells, and in the year 1901, he drove another well, which wells tapped the underground waters, and that the combined flow of the seven wells, during a period of maximum flow, is approximately seven gallons per minute, and during the winter, spring, and autumn months of each year, approximately four gallons per minute. That the period of the maximum flow of plaintiff's wells and springs follows closely the heavy run-off of the melting snows and spring rains from the Wasatch Range of mountains to the east of plaintiff's land, and the height of the irrigation season which is contemporaneous with said run-off in the particular locality where the springs and wells are located each and every year, the waters from which mountains are distributed for irrigation purposes on lands lying above and to the east of the land of the plaintiff and defendants herein described, and to the south, southeast, and northeast thereof, and partly on the upper lands of the plaintiff herein described, and partly on the upper lands of the defendants herein described. That there is located in Sanpete county about two miles northwesterly from the city of Ephraim, a certain artesian district, the exact boundary of which is unknown, but which underlies the west 80 acres of plaintiff's land, and also underlies a great portion of defendants' land; but the exact boundary of said artesian basin is not ascertainable from the evidence. That said artesian basin is fed from the waters falling on the mountains and in the canyons adjacent to Ephraim City, Sanpete county, state of Utah, which said waters sink into the ground on said mountain and in said canyons and form and constitute a natural source of supply to the said artesian basin. That the waters of said basin constitute the source of supply common to all the springs and all the

wells involved in this action and on plaintiff's and defendants' land alike, and is underground approximately 100 to 150 feet; and all of said springs and wells are affected in substantially like manner and approximately to the same extent within a radius of one-half mile, varying with the distance from defendants' No. 10 Kimball pump hereinafter referred to, by the operation of said pump, by variation from year to year in the rainfall and snowfall on said mountains, and by the variation in the seasons of each and every year, and said springs and wells are similarly affected by the different seasons of each year, winter, spring, summer, and autumn. That prior to the year 1916 the defendants bored a few artesian wells on their land which had no noticeable effect on plaintiff's springs nor upon plaintiff's wells. That about the month of August, 1927, defendants bored a large well on their premises 500 yards north from plaintiff's springs and wells, and placed in said large well a No. 10 Kimball pump, with a capacity of 1,000 gallons a minute. That after the installation of said Kimball pump in the summer of 1927, the water raised to the surface thereby varied from 525 to 900 gallons a minute. That there is a direct and positive connection between the waters and the water bearing bed or stream at the defendants' said Kimball pump, and the waters issuing from plaintiff's springs and wells aforesaid, and the use of said Kimball pump in said well where it has been used diverts the water away from plaintiff's wells and springs aforesaid, and has so diverted the water away from plaintiff's springs and wells whenever said pump has been used. That said water so raised to the surface by defendants by the use of said Kimball pump was not and is not developed water, nor was it every appropriated by the defendants, and that it is not upon a creek channel or subterranean stream. That plaintiff and his predecessors in interest appropriated all of the waters flowing from plaintiff's said springs as early as 1884, and from plaintiff's said wells as early as 1889, for the purpose of irrigation and for domestic and culinary purposes, all of which purposes were

necessary and beneficial, and plaintiff appropriated as early as 1901 all of the waters of his seventh and last made well, for the same purposes.

It very clearly appears from the evidence that a tract of about 9 acres of land situate immediately to the east and south of plaintiff's wells and springs, is low ground, and that the run-off from the rains, melting snows, and irrigation of approximately 2,000 acres of land lying to the east and south thereof drains into that low area within the boundaries of plaintiff's land; that plaintiff, many years prior to the commencement of this action dug a trench from this low area and into the pond where the waters from plaintiff's springs and wells are collected, at a point where plaintiff claims his main spring issued from the ground. While there is ample evidence to support the finding of the court that there have been springs and seeps as claimed by plaintiff from the time when the memory of man runneth not to the contrary, yet it is also very clear that a large portion of the waters now making up the flow of these springs is from a source near or on the surface and that they are not so directly affected by the operation of defendants' Kimball pump as are plaintiff's wells. We therefore come to the conclusion that, in affirming the judgment, plaintiff's right must be determined by the flow of the wells. If the defendants are restrained from interfering with the normal flow of the wells, we think it necessarily follows that the flow from the springs will not be diminished by the operation of the pump. The claim of the defendants which we think is supported by the evidence is to the effect that the Kimball pump when operating lifts from 525 to 900 gallons per minute. The court's findings as to the total supply of plaintiff's wells and springs are to the effect that they flow 9 acre feet in five days. We think the great preponderance of the evidence is to the effect that the total flow is 4 acre feet in nine days, or approximately one-fourth of a cubic foot per second of time, as compared with the defendants' flow amounting to somewhere between $1\frac{1}{4}$ and 2 cubic feet per second of time.

It is evident, therefore, that the defendants cannot complain if the judgment is affirmed under the rule laid down by this court in *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883. This would be true even though we were to assume that the artesian basin underlies all of the land owned by defendants, a fact not found by the court and not established by the evidence. But the area underlaid by the artesian basin is not in fact found by the court, and in the opinion of the writer, it is beyond the scope of reasonable investigation to so determine such fact. In this regard, it is interesting to note the case of *Peterson* v. *Lund,* 57 Utah 162, 193 P. 1087, 1090. In that case the waters of Shumway Springs in Sanpete Valley and only a very few miles distant from the springs in issue in this case, were involved. The finding of the court in that case was that the artesian basin is 30 miles long, 4 miles wide, and covers an area of approximately 120 square miles, undoubtedly including the land and water in issue in this case. Whether the court was right in that case in fixing the area of the artesian basin at 120 square miles, or whether the court is right in this case in merely finding that 80 acres of plaintiff's land and a large portion of defendants' land are in the area, may make little difference; but these cases do demonstrate the practical impossibility of locating the limits of an artesian basin either by men in the field, trying to determine to what extent they may safely proceed to improve land relying on underground water, of later by the court in trying to unravel the unfortunate knots that the application of the doctrine of reasonable use and correlative rights are sure to lead to.

It is difficult to determine what rule of law either of the parties relied on in the presentation of their case, and it is just as difficult to determine upon what theory of law the court found the issues and rendered its judgment. Both parties pleaded that their direct source of supply is an artesian area underlying their respective tracts. Plaintiff asserts that the pervious strata of earth bearing water is common to both tracts. The defendants assert that the water bearing

strata underlies their ground, that pervious strata underlies about two acres of plaintiff's land, and that there is some slight connection between some water strata underlying the Kimball pump and plaintiff's well. Plaintiff pleads a prior appropriation, and the defendants allege that the large pump draws its water from an underground stream which does not pass under plaintiff's land. The court finds that there is an artesian area common to plaintiff's land and a large portion of defendants' land and also finds that the plaintiff appropriated all of the waters of his springs and wells prior to the time the defendants began digging their wells. If the judgment is supported under the theory of an appropriation, then it necessarily follows that the fact that the waters flowing from plaintiff's wells and springs come from an artesian basin is immaterial. If the doctrine of the Horne Case is to be applied, then it must be because the doctrine of appropriation cannot be applied to waters in an artesian area.

But the confusion may well be expected. It is because fundamental principles of law are at war with each other, and with rules of nature that are constantly asserting themselves in opposition to these conflicting legal principles.

The doctrine of correlative rights can be nothing more than a modification of the rule that the owner of the surface owns to the lowest depths, including the water percolating therein. Under the English rule, each man could take the water from beneath, even though it resulted in taking the water out of his neighbor's ground. Under the modern doctrine, the owners of the surface may take jointly or proportionately from the underground supply, even though it may result in greatly diminishing the flow of the springs and wells which the first user may have used as the basis of developing valuable property. This rule is not based on the idea of appropriation; it must rest on the theory of a combined ownership of the underlying waters.

There can be no more ownership of water moving through the soil than there can be of ownership of water moving

across the surface. It is evasive and constantly changing. In either case any use must of necessity be in its nature usufructory only. This doctrine has always been recognized with reference to surface water but eminent jurists in England and in America came to the conclusion that water in the soil was owned by the owner of the surface, the same as the rock, sand, or minerals stationary in their nature. Because of this misconception, there developed the inconsistency that a man in taking his own water from his own ground could draw the water from his neighbor's soil and thereby dry up the wells and springs, kill the verdure growing on his ground, and ruin his habitation.

To adopt the rule of correlative rights may modify and lessen the evils of this rule; but it does not cure. In this state the law of prior appropriation had been recognized as being most feasible to the development of our resources. From the beginning of our history, when a man went upon a stream of water, diverted it, and applied it to a beneficial use, his right to the use of that stream was recognized as being prior and superior to the rights of all subsequent appropriators to the extent of the reasonable necessities of the man making the first appropriation. During the progress of our development, as new conditions presented themselves from time to time our courts have consistently enforced this right of priority and protected appropriators not only as against all subsequent claimants taking water from the body of the stream, but as against all persons interfering with its source. It makes no difference whether the interference be with the main stream or the tributaries thereto, or whether the interference be with water flowing over the surface of the ground, flowing in subterranean streams or merely percolating through the ground. The burden has always been placed upon the prior appropriator to show that subsequent claimants have interfered with his right to the use of the water, but when that is shown he is protected whether the interference is with surface flow, subterranean stream, or percolation.

In *Horne* v. *Utah Oil Refining Co.*, supra, a state of facts somewhat similar to the facts in *Katz* v. *Walkinshaw*, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35, were presented to the Supreme Court of our state for consideration. It appears that under a tract of ground situated just north of the city of Salt Lake there is what is commonly spoken of as an artesian basin. Residents and owners of the surface drove wells into that basin and secured flows of water adequate for their use for domestic and culinary purposes, and for the irrigation of their lawns and gardens. Thereafter the Utah Oil Refining Company purchased a small parcel of ground near the lower extremities of the land overlooking the basin, drove therein a large number of wells, and conveyed the water which flowed therefrom to other lands on which they had established large refineries, with the result that the pressure of the wells of the home owners on the lands overlying the artesian basin was diminished. Justice Thurman, in a well-written opinion, reviewed *Katz* v. *Walkinshaw*, supra, at length, quoted copiously therefrom, and arrived at the conclusion that the case should be controlled by the doctrine of correlative rights and reasonable use.

There is no question but that under the facts of that case it was correctly decided. The limits of the artesian basin were determined with a reasonable degree of accuracy. The contour of the surface and the pressure that forced the water to flow were such that, until the defendant began withdrawing water on a large scale, the plaintiffs, all of whom had been enjoying the use of the water for more than twenty years, were receiving water to the extent of their respective necessities. And it was also apparent in that case that, if the defendant company had used water to the extent and in the same manner that it was being used by the plaintiff for the growing of lawns and gardens and for culinary and domestic purposes upon their ground overlying the artesian basin, they would not have interfered with the plaintiff. In other words, by the application of the doctrine of correlative

rights, plaintiff's rights were preserved and the defendants were permitted to use the surplus waters in the basin upon their land to the extent of their necessities. The same result would have been reached by the application of the doctrine of priority of appropriation as recognized by the law of our state in every other case that has been presented for consideration. But for some reason that we are unable to appreciate some jurists have reached the conclusion that the same rule that determines the right to the use of the water before it enters the artesian basin and after it leaves, cannot be applied in determining these rights during that short period of time that it moves in its everlasting circle through that part of the earth where the water happens to be under pressure, because of overlying impervious strata.

In the opinion of the writer, the facts in the case now before us for disposition very aptly illustrate the fact that an artesian basin is nothing more than a body of water more or less compact, moving through the soils with more or less resistance. The source of the water is the rainfall on the mountains to the east of Sanpete Valley and upon the alluvial fans and deltas skirting the west base of the mountains, and waters applied to the irrigation of the higher lands lying to the east and nearer the base of the Wasatch Range. The water so falling or being applied upon the surface sinks into the deeper strata and thence moves along the lines of least resistance toward the Sanpitch river which flows in a southerly direction in the bottom of Sanpete Valley, near the outer toe of the detritus that has been carried from the mountains during the ages and roughly paralleling the course of the Wasatch Range. No doubt much of the water that passes through the area now under consideration is collected in the bed of the canyon called Pigeon Hollow, which drains about nine sections of land on the Wasatch Range and enters Sanpete Valley about one and one-fourth miles east of defendants' pump. Borings made in the earth's surface demonstrate quite clearly that there are many strata of earth of different density underlying the alluvial fan at the mouth of

Pigeon Hollow. And it also appears with reasonable certainty that gravel and sand strata are located at different and somewhat irregular depths under the surface and extending from the vicinity of the mouth of Pigeon Hollow and outward toward the Sanpitch river under the area owned by the parties to this action. Wells in the vicinity of the mouth of Pigeon Hollow and to the west thereof, varying in depth from a few feet to as much as 150 feet, which pierce one or more of the gravel or sand strata, establish quite conclusively that these pervious strata are carrying water which comes from the uplands into the soils forming the bed of Pigeon Hollow and thence move westerly in its downward course through the area where the waters in dispute are located and on toward the probable surface outlet in the Sanpitch river. Borings demonstrate that thick layers of comparatively impervious materials overlie and underlie these pervious water bearing strata. When these different strata are pierced by wells driven from the surface, the result is that the water in the pervious strata, impeded to a greater or lesser extent in its forward movement, rises to the surface in quantities depending upon the degree of resistance and pressure applied beneath the earth's surface. The defendants' well in which the large pump is placed pierces one of these water bearing strata where there is a comparatively large quantity of water which with the aid of the pump is lifted to the surface with the result that it interferes with the flow of plaintiff's wells and springs. Pressure varies in different wells throughout the artesian area, and it also varies as different strata of water bearing materials are punctured. The static head of the water in the wells, the level of the ground water table, and the surface of the ground all slope to the west with approximately the same rapidity. From these facts it may be fairly inferred that the resistance which causes the water to rise in the wells is merely the action of the water in percolating or oozing through the soil, and not an impervious dike over which the water must flow before it can continue in its downward course. When the

pressure is released, as was done by driving the big well and installing the pumps, water in the surrounding country gravitates toward the point of least resistance with the result that wells and springs fed from the same common source of supply are affected.

It necessarily follows that it is impossible to apply the doctrine of reasonable use or correlative rights so as to give any assurance of permanency to men who may spend their money in developing sources of water supply, improving the country, and building their homes. Plaintiff in this case had lived for half a century upon his ranch, during which time he used, enjoyed, and depended upon the water supply he had developed and appropriated. Then the defendants, under claim of right to take what is in their own soil, drove wells and tapped the source of supply that had fed plaintiff's wells and springs. The only assurance that the defendants can have that some one else with more power or new devices or at a more favorable point will not in turn sink wells and deprive them of what they have spent years of toil and much treasure to develop lies in the application of the law of priority of appropriation. The law of correlative rights of necessity cannot do it. It varies only in degree from the maxim that the owner of the soil owns to the lowest depth including the water that percolates through it. To say that the owners of the surface own correlative rights in the underground moving body of water is to give to the word "ownership" a new meaning. The owner is one who has dominion of a thing real or personal, corporeal or incorporeal, which he has the right to enjoy and to do with it as he pleases. As well talk of owning the air as it passes overhead as to talk of owning the water as it passes beneath. There can be no ownership of a thing that is evasive, constantly changing and moving onward. There may be a right of use as it passes, but nothing more unless it be in fact captured.

If every person owning land over a waterbearing area shall be permitted to share with every other person whenever he shall see fit to drive his well, it is very probable, if

not quite certain, that as the process of development goes on, many, if not all, will find themselves restricted in their use of the water they have brought to the surface to the extent of ruination. If the defendant is right in his theory of the source of the water involved in this discussion, then it would seem that the owner of the land in the mouth of Pigeon Hollow could, by driving sufficient wells on his premises, rob not only the plaintiff but the defendant as well, of all they have builded, unless a proportionate share would prove to be sufficient for their needs. It does not make proof to satisfy those who know this arid country that a proportionate share would be insufficient to properly irrigate and farm the surface in most places, if not in all.

The doctrine of reasonable use necessarily implies the right of one landowner to take the water that is passing through his neighbor's soil and apply it to a beneficial use upon his premises. It completely ignores the right of ownership of the water in the owner of the soil. There is no rule of law upon which it is based. The only support upon which it rests is the notion that it is the policy which will tend most materially to the development of the commonwealth and the protection of our citizens in their property rights. With this notion we are unable to agree. In our opinion it will cause strife and discord through the years. It will make people hesitate to invest their time and money in the development of properties depending for their value upon underground sources of supply. Without the expenditure of untold sums of money in testing the scope of a given underground water supply, they will be entirely without means of knowing how many acres will be entitled to participate in the use of the water. The evidence in this case demonstrates that the supply of underground water varies with the years as do the surface streams. In times of plenty, new developments may cause the use to be extended, and in periods of drouth it will necessarily follow that all will suffer. This we think should be avoided. To our minds the same rule should be applied to underground water as to surface streams.

The law of priority of use has been the guide in this state from the beginning. After fifty years our people were so well pleased that they enacted an extensive Code for protection of the prior appropriators of the water of our streams, and, so far as we have learned, there is no one to complain. The law has proved beneficient and satisfactory. In our judgment the same results would follow if the same rules of law are applied to underground waters.

It would almost seem that we have already by former decisions applied the law of prior appropriation to underground waters. We have held that, if a man digs a hole in the ground and thereby permits the water of the surrounding territory to percolate into the hole, a spring is thereby developed, and that it is the subject of appropriation (*Sullivan* v. *Northern Spy Min. Co.*, 11 Utah 438, 40 P. 709, 30 L. R. A. 186) ; if wells are driven into a subterranean body of water, and a spring is dried up, the owner of the wells will be enjoined from permitting them to flow; if a tunnel is driven into a mountain and percolating waters are gathered with the result that the water of a surface stream is affected, the water cannot be claimed by the person who drove the tunnel; if a man digs a trench across his lands and thereby intercepts the ground water percolating through his lands to lower levels with the result that a prior user is injured, the prior user can enjoin the injury. Everywhere in the Western States it is the law that, if a man develops water from a source that has not been theretofore appropriated, the developed water can be appropriated and the rights of such individual will be protected. But it seems to be doubted whether, if a man drives a well into the earth and thereby pierces strata of water bearing soil under pressure, he can appropriate it even though it is not subject to any prior appropriation. It would seem that, if the aperture through which water is brought to the surface of the earth and there applied to a beneficial use is made by nature, the law of prior appropriation applies; but, if the aperture is man-made, then the law of correlative rights should apply. Even though the

aperture is man-made, if it is driven horizontally into the earth and an underground supply of water tapped, it is still the subject of appropriation, but, if the aperture is vertical and pierces a water bearing stratum beneath, then the right to its use must forever be subject to the possibility of some one else driving a well on their ground and sharing the supply.

To the writer's mind these distinctions are not based on common sense. They have neither rhyme nor reason in them and they do not harmonize with the rules of nature. It ought to make no difference as to the kind of a channel through which water reaches the sunlight. Neither should it make any difference whether the channel is an ancient or a modern one. Once the water bubbles forth to be used by man in the reclamation of our desert areas, whether from a pipe driven into the earth by man or as the result of an earthquake or some other force of nature, the first to apply to a beneficial use should be protected. This rule can work no hardship on any one. If in a given case there is enough for all, then it follows that priority will not affect the situation. If the event should prove that the supply is insufficient, the experience with surface streams has fully demonstrated that the law of priority is the safest guide.

We are not altogether lacking for authority in adopting this course. In the year 1907, five years after *Katz* v. *Walkinshaw*, supra, the California Court of Appeals expressed itself as follows:

"The fact that the flow of the stream from the spring is caused by water percolating through the soil does not deprive it of the character which makes it subject to appropriation. 'Where percolating waters collect or are gathered in a stream, running in a defined channel, no distinction exists between waters so running under the surface or upon the surface of the land.' *Cross* v. *Kitts*, 69 Cal. 217, 10 P. 409, 58 Am. Rep. 558. Water passing through the soil, not in a stream, but by way of filtration, is not distinctive from the soil itself; the water forms one of its component parts. In this condition it is not the subject of appropriation. When, however, it gathers in sufficient volume, whether by percolation or otherwise, to form

a running stream, it no longer partakes of the nature of the soil, but has become separate and distinct therefrom, and constitutes a stream of flowing water subject to appropriation. The water in question here is the stream issuing from the wells, and it is immaterial for the purposes of this discussion whether this stream is supplied by water percolating and filtering through the earth or not; at all events, it has gathered into a stream. No distinction can be made between the water flowing from these artesian wells and that flowing from springs. 'Water rising to the surface of the earth from below, and either flowing away in the form of a small stream or standing as a pool or small lake,' is the definition of a spring given by the Century Dictionary. This definition is equally applicable to an artesian well. The stream in either case may result from the gathering of water at some point, whether near or distant, which produces the stream, the flow of which is by natural causes forced to the surface. In the one case the aperture or opening through which it finds its way to the surface is the result of nature's forces; in the other, it is produced by artificial means. The fact that it is produced by boring a hole in the ground in no wise changes its character. In either case the water flows to the surface naturally. When a stream of unappropriated water flows from an artesian well, having its location upon unoccupied government land, it is the subject of appropriation to the same extent as the waters of a natural spring likewise located." *De Wolfskill* v. *Smith,* 5 Cal. App. 175, 89 P. 1001, 1003.

Mr. Kinney, in his work on Water Rights, makes the following criticism of the De Wolfskill Case:

"It seems to us that the court of appeals endeavored to draw a too fine distinction between 'artesian waters' and waters flowing from the artesian basin. Then, again, the court was unfortunate in its comparison as to the water flowing from an artesian well—an artificial means of diversion—and that of a spring, a natural source of water supply. As well might the court have said that the water might be appropriated from an artificial ditch or canal as from an artificial well. The artesian well was but the artificial means of the diversion of the water from the artesian basin."

What difference can it make that the water flowing from an artesian basin passes from the natural source of supply through a pipe or through a tunnel driven horizontally into a mountain or through a drain intercepting percolating waters. In either event it is only a means of reaching the source of supply. Whether it be ap-

propriated at the mouth of a spring or at the mouth of a well in this state ought make no difference. An appropriation when made follows the water to its original source whether through surface or subterranean streams or through percolation. Again Mr. Kinney says:

"The waters of these artesian basins, although they are in a way percolating, being held under an impervious stratum of clay or rock and under pressure of itself from above, legally must be treated as a class by themselves. They differ from the ordinary percolations in that they are above the impervious stratum and are under no pressure. There is also a distinction betwen wells having a natural flow and those not so constituted. It is, therefore, obvious that different legislation and laws are required peculiar to those waters and wells from those of ordinary percolation."

Here again Mr. Kinney in his discussion reverts to that peculiar idea that, because water happens to be for the time being under pressure of impervious strata, a different rule should apply in acquiring rights to its use than should apply either before it enters the area of pressure or after it passes therefrom. The distinction is one without a difference. If the law of prior appropriations is applied to water at any stage of its eternal circle, it should be applied at every stage. Different rules applied to the same subject-matter for such slight differences as have been pointed out cannot be in the interest of public welfare and must inevitably lead to increasing confusion.

The same learned author brings himself more nearly in harmony with the principles of nature and the underlying human rights when he uses the following language:

"While the artesian waters still remain in their natural artesian basins underlying the public land of the United States, undiscovered and untapped, no valid appropriation can be instituted of them which will in any wise affect the title of the lands afterward acquired from the government by private individuals or others. It is only after the wells have been sunk and the water rises to the surface of the earth and forms a stream, the same as though they flowed from natural springs, that a valid appropriation can be made of them and finally consummated. In other words, a stream of water must be discovered

and must be produced, and in this respect it makes no difference whether the aperture or opening through which it flows is the result of nature's forces or the result of the sinking of artesian wells by artificial means. When, however, a stream of unappropriated water flows from an artesian well, having its location on unoccupied government land, it is the subject of a valid appropriation to the same extent as the waters of a natural spring likewise located, under the acts of Congress of 1866, and 1870, where the right of appropriation of water is recognized by the local customs, laws, and decisions, of the courts. The appropriator takes the water at the starting point; that is to say, at the mouth of the well, and if, after the right of the appropriation has once vested, the government sells the land upon which the artesian wells are situated, the purchaser takes it subject to the right acquired by the appropriator, both as to the waters flowing from the wells and the right of way for the necessary ditches used in connection therewith. Therefore, while the land is still a part of the public domain the posting of a valid notice of appropriation of the waters of certain wells, sunk thereon and abandoned by the parties sinking the same, by another person followed up with reasonable diligence in the construction of the ditches for the conduction of the water to the place of use, constitute a valid appropriation of the waters flowing from the well, together with the necessary rights of way. The water in question being the stream issuing from the surface of the earth, it is immaterial whether this stream is supplied by water percolating and filtering through the earth or not, after it has gathered into a stream and flows over the surface of the earth."

In *Peterson* v. *Lund*, supra, the question for determination was the right to the use of water flowing from springs which had been appropriated for many years. Defendant had driven wells into an artesian basin which resulted in diminishing the flow of the springs. The defendants insisted that the doctrine of reasonable use or correlative rights should control. The court says:

"In view of the importance of the subject, all of the Legislatures, as well as all of the courts within the arid zones of this country, have not only recognized the right of appropriating the waters flowing from springs, but that right has been established and fixed beyond question. Congress has also fully established and protected the right. It is also well settled that in acquiring the right to the use of water flowing from springs the source of the water is not controlling. That proposition has frequently been decided by the courts."

In *Peterson* v. *Wood,* 71 Utah 77, 262 P. 828, 833, decided in 1928, there was involved the question as to whether a man may dig trenches on his own land and thereby intercept percolating waters that were appropriated and used on lower land. Justice Thurman in upholding the right of the prior appropriator concluded his opinion with the following pertinent language:

"It is wholly immaterial whether the water of the Wood spring is percolating water, as that term is known at the common law, or whether it is the water of a subterranean stream. We believe that the cases to which we have referred have settled that question once for all in cases of this nature, and settled it right."

In justification of the conclusion reached that percolating waters are the subject of appropriation when collected into a well, spring or stream, the court in the Sullivan Case and in the *Peterson* v. *Wood* Case, heretofore referred to, calls attention to the statutes of Utah then in force, defining a vested right by appropriation. Comp. Laws Utah 1888, § 2780:

"1. Whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring, or other natural source of supply."

Certainly, every reason that would induce a person to call the percolations of water through the ground as in the Sullivan Case, where a hole is dug into the ground and the water merely seeps into it, a natural source of supply, ought to apply in a case where a pipe is driven into the ground and the water gushes forth as a result. It is none the less a natural source of supply merely because it happens at the time to be passing through an area of pressure. The foregoing provision of the statute was the law of this state when plaintiff dug six of his wells and until the year 1897, when it was modified, but in the judgment of the writer the change was one of form merely.

In *Crescent Min. Co.* v. *Silver King Min. Co.,* 17 Utah 444, 54 P. 244, 70 Am. St. Rep. 810, it is held by this court that,

where a man digs tunnels in his own ground and thereby intercepts and collects the percolating water therein in sufficient quantity that it flows off his premises, it cannot be appropriated by another person. But we do not have such a case here. Here the plaintiff's predecessor in interest in the year 1889 drove six wells on his own premises and from then on and continuously until the interference of the defendants in the year 1927 used the waters flowing from said wells upon his own premises for economic and beneficial purposes. These waters came from a natural source of supply that was unappropriated and unused by any one. It was unnecessary, until the year 1903, to make a record of an appropriation of water. If the water was in fact diverted and put to a beneficial use, that was sufficient. All that the plaintiff did. We think his rights should be protected as an appropriation with a right of priority the same as if the diversion had been directly from the surface. Having been there from the early settlement of our state, it is not right to subject him or his successors in interest to the hazards of other wells, few or many, being driven somewhere within the limits of the Sanpete artesian basin, either as imperfectly described under the evidence in this case, or in the Peterson v. Lund Case heretofore referred to, or in some other case that may arise in the future.

The plaintiff should be required to keep his wells cleaned and in such condition as to permit the water to flow freely therefrom, and, when so cleaned, the defendants should be restrained from operating their Kimball pump whenever the combined flow of plaintiff's seven wells is less than seven gallons per minute during the period of maximum flow in the months of June and July and the first half of the month of August, or when the combined flow of said wells is less than four gallons per minute during the remainder of the year. As thus modified, the judgment should be affirmed. Each party to bear their own costs on appeal.

EPHRAIM HANSON, J., concurs.

STRAUP, Chief Justice (concurring).

I concur. Upon the facts and the record, I think the doctrine of correlative rights is inapplicable and impracticable, and that the doctrine of appropriation and beneficial use should be applied. While the exact scope and extent of the area of the artesian basin was not found, yet the court found that it was approximately 30 miles long, 4 miles wide, and covered approximately 120 square miles. To ascertain with any degree of certainty the limits, quantity, or character of the underground waters of such a basin, as here and as shown by the record, is quite impossible, and to attempt to make an award of the waters on the theory or doctrine of correlative rights and according to surface area of the lands of the respective owners, here many of them, some owning tracts of large, others of small, acreage of variant duties of water, is impracticable and bound to lead to unjust awards; and, where those of large acreage and with installations of large pumps, pump 1,000 or more gallons of water a minute from the basin, and casting on the first user or users the burden of showing that such subsequent users are not only taking more than their share of the waters measured on the basis of surface area but also waters belonging to such prior user or users, is, from a practical viewpoint, to give such subsequent users an unjust advantage and detrimental to the rights of the first user. As to further views entertained by me on the subject, I refer to my concurring opinion in the case of *Wrathall* v. *Johnson* (Utah) 40 P. (2d) 755, decided January 2, 1935. As I there said, I say here, all subterranean or artesian basin waters may not be regarded as mere percolating or diffused waters and then as a convenient shotgun method of determining rights therein or thereto, apply the doctrine of correlative rights. The subterranean waters here are not mere percolating or diffused waters. They rather consist of a subterranean body or basin of water in character more or less wild, moving forward in a body in lines of least resistance or held in a depression as a body or

basin of water similar to a lake or body of water on the surface and as such subject to appropriation. To apply the doctrine of correlative rights to such a vast area as here—120 square miles—seems to me to be unworkable, and that the only just rule to be applied is the doctrine of appropriation and beneficial use, first in time, first in right. Where, as here, it is shown that, by the pumping of waters from the basin by a subsequent claimant or user, the first user is deprived of waters of the basin theretofore appropriated and beneficially used and acquired by him, and where the rights of the first user may be fully protected, I see no reason why, instead of enjoining the subsequent claimant from pumping water when by doing so the flow of water of the first ceases or is diminished, the subsequent claimant may not be permitted to supply the first and prior user at the orifice of his well or point of diversion, waters from the basin, in quantity and quality as theretofore appropriated and acquired by him, or to the extent that his waters may be diminished by the pumping of the subsequent user.

During the trial, the defendants in effect tendered such an offer or at their expense to drive the plaintiff's well deeper, in the event the court on the issues was of the opinion that the injunction should be granted, but what became of the offer is not disclosed, nor does it appear that any inquiry was had with respect thereto, or as to the feasibility thereof, or as to whether the rights of the plaintiff could thereby be fully protected. However, since no ruling respecting the matter was invoked in the court below and no point concerning it made or discussed by either party on the appeal, nothing binding may now be ruled on it.

ELIAS HANSEN, Justice (dissenting).

Plaintiff by this action seeks to quiet in himself title to certain artesian wells and so-called spring water upon his land together with damages because of the alleged unlawful interference therewith by the defendants and for injunctive relief prohibiting the defendants from pumping water from

their land. By their answer defendants denied that they have damaged plaintiff, and also denied that they have interfered with any of plaintiff's water rights. Defendants also filed a counterclaim seeking to quiet in themselves the right to the use of the water which they have pumped and claim the right to continue to pump from their lands. Upon the issues thus joined a trial was had to the court sitting without a jury. Findings were made to the effect that plaintiff had acquired, by appropriation, a right to the use of the water flowing from the well and springs upon his land; that defendants by operating pumps upon their land had wrongfully interfered with plaintiff's water rights to his damage, but the amount of such damage could not be ascertained. A decree was entered quieting in plaintiff a first and prior right to the use of the water flowing from the artesian wells and springs upon his land. Costs and nominal damages in the sum of $6 were awarded plaintiff. Defendants were enjoined and restrained from operating any pumps upon their land "to the extent of interfering with the natural and normal flow of plaintiff's springs or wells." The defendants appeal.

By their assignments of error appellants attack a number of the findings, some of the conclusions of law, and the decree. All of the evidence received at the trial is preserved in a bill of exceptions and is brought here for review. The transcript of the evidence consisting of more than 1,100 pages together with numerous exhibits make a record so voluminous that it is impossible, within reasonable limits, to state even the substance thereof. In the main, the evidence is not in conflict. The following facts are either admitted or established by a clear preponderance of the evidence: Defendants are, and at the times complanied of were, joint owners of 544.8 acres of land situated in sections 28 and 29, township 16 south, range 3 east, Salt Lake Meridian, Sanpete county, Utah. Plaintiff is, and at the times complained of was, the owner of 127.05 acres of land situated in section 33, township 16 south, range 3 east, Salt Lake Meridian, in

Sanpete county, Utah. The lands of plaintiff and defendants are coterminous; defendants' land being north of plaintiff's land. Plaintiff's land was segregated from the public domain on April 5, 1883, at which time plaintiff's predecessor in title entered the same as a homestead. Patent to plaintiff's land was issued on November 9, 1891. Defendants' land was segregated from the public domain on the following dates: 160 acres on May 6, 1873; 160 acres on March 27, 1883; 160 acres on August 27, 1888; 43.8 acres on May 4, 1891. The record is silent as to the date when 20 acres of defendants' land was segregated from the public domain.

Extending in an easterly and westerly direction through a part of plaintiff's land is what the witnesses describe as a swale. When Sanpete Valley was first settled, the swale was covered with a meadow consisting of wire, salt, and other native grasses. Some of the early settlers of Sanpete Valley went to the swale on what is now plaintiff's land and there made adobes for the construction of houses in what is now the city of Ephraim. During the process of making adobes, holes were excavated in the swale. These holes filled with water and during at least a part of some years the water flowed out of the adobe holes onto the meadow below. In about the year 1884, plaintiff's predecessor built a dam across the swale and by that means a small reservoir was created above the dam in which reservoir the water coming down the swale was confined. In about the year 1889, plaintiff's predecessor drilled six artesian wells. The water from five of the wells so drilled was stored in the reservoir theretofore constructed on plaintiff's land. At times the water from the reservoir flowed down onto the meadow below. In the year 1901, plaintiff drilled another well near his house, the water from which when not used for culinary purposes ran into the reservoir. Prior to 1916, the exact date not appearing, defendants drilled a number of wells on their premises. At various times a pump was installed in some of these wells. Beginning with the year 1916, defendants pumped water from some of their wells onto their land. In

1927, defendants drilled a well 26 inches in diameter and 103 feet deep on their premises and installed therein an electric pump with a capacity of 1,000 gallons per minute. The pump so installed was operated during a part of the irrigation seasons of 1927, 1928, and 1929. The water so pumped was used for the irrigation of defendants' lands. Following are the approximate amounts of water pumped by the defendants during various years: 1916, 6,000,000 gallons; 1917, 12,-000,000 gallons; 1918, 25,000,000 gallons; 1919, 40,000,000 gallons; 1920, 7,000,000 gallons; 1921, 10,000,000 gallons; 1922, 9,000,000 gallons; 1923, 1,000,000 gallons; 1924, 14,-000,000 gallons; 1925, 17,000,000 gallons; 1926, 35,000,000 gallons; 1927, 20,000,000 gallons; 1928, 42,000,000 gallons; 1929, 53,000,000 gallons. The wells on the lands here in controversy are of various depths varying from 75 to 250 feet. In drilling the wells, artesian water was encountered at five or six different depths, clearly indicating that there are a number of water bearing strata underlying the lands here in question. Plaintiff's wells are located near his reservoir. The surface of the ground from the north, east, and south slopes towards the reservoir. The surface of the ground where plaintiff's wells are located is about 10 or 11 feet lower than the surface of the ground where most of the defendants' wells are located. Such is the case with respect to the large well in which defendants installed their large pump. As a result of the difference in elevation of the surface ground at the various wells, a number of them on defendants' land will not flow unless pumped. Water in the large well in which defendants installed their Kimball pump, the operation of which is here complained of, does not flow without being pumped, but rises in the pipe to a point 7 or 8 feet below the surface of the ground. When not interfered with by the operation of defendants' pumping operations, the total flow of water from plaintiff's wells varies from four to seven gallons per minute.

There is a difference in the opinions of the experts who testified at the trial as to the source of the water that feeds

the artesian basin underlying the lands of the parties to this controversy. The expert who testified for the plaintiff expressed it as his opinion that the artesian basin in question was in the main fed by water applied in the irrigation of the lands lying to the east of the premises in question. He based his conclusions in such respect in great part upon the fact that the pressure of the water in the wells was weak and such as might be caused by water being confined between two impervious strata extending a short distance to the east of the wells. He indicated that, if the water became impounded between two impervious strata which extended farther to the east onto the higher ground of the foothills, the pressure in the wells would be much greater than it is. The expert evidence of the defendants is to the effect that the artesian basin in question is fed from water which becomes impounded between two impervious strata which extended into the foothills to the east and particularly into Pigeon Hollow; that the water so impounded finds its way to defendants' land in a subterranean stream or channel. The trial court found that the artesian basin in question is fed from both sources. There is ample evidence to sustain such finding. The evidence touching the source of the so-called springs on plaintiff's land is far from satisfactory. It is made to appear that at an early date water seeped into the swale on plaintiff's land from the surrounding territory. It is likewise clearly established that there was sufficient water in the swale to maintain a meadow thereon and that, except during dry seasons, some water flowed down the swale and over the meadow. The amount of the water so flowing is variously described as a mere seep and as sufficient to flow in one, two, or three rows. There is also evidence that at times there was no water in the swale and that the so-called springs were entirely dry. The presence of water, the amount thereof, or the lack of any water in the swale, on what is now plaintiff's land, at various times at an early date may well have varied from year to year and at different seasons of each year. The amount of precipitation in the vicinity of

the land in question would of necessity affect the amount of water, if any, that from time to time found its way into the swale. The evidence also shows without conflict that for many years prior to about 1922, considerable waste water flowed onto the land in the vicinity of plaintiff's land. Some of such water was diverted onto plaintiff's land. Since 1922, the waste water has been diverted elsewhere. The total flow of the springs and seeps on plaintiff's land varies from about 100 to 180 gallons per minute. At the time of the trial the pond which plaintiff used as a reservoir in which to store the water from his artesian wells and so-called springs covered an area of about one acre. One witness described the pond as being, at the time it was first constructed, about twice the size of the courtroom; that the pond was enlarged and cleaned out from time to time is shown by the evidence without dispute. It is also made to appear that two drain ditches have been constructed on plaintiff's land, that a very substantial proportion of what plaintiff claims as spring water seeped into the drains and is discharged into plaintiff's pond. The evidence showing or tending to show that plaintiff's so-called springs are fed by water from an artesian basin is very meager. Plaintiff's expert witness apparently believed that the so-called spring waters were not fed from an artesian basin. Upon this record the only conclusion permissible is that a very substantial part, if not all, of the water which flows from plaintiff's so-called springs comes from the irrigation of the lands in the immediate vicinity, including the lands of the defendants.

The depth of plaintiff's pond or reservoir is variously estimated. Some witnesses placed its depth as one foot, others as four feet. The discrepancy may be accounted for by the fact that the pond was from time to time cleaned out and enlarged.

There is a conflict in the evidence as to the use plaintiff has made of the water which has flowed into the pond. Plaintiff testified that, when the pond filled up with water during the irrigation season, it was from time to time released and

used to irrigate his land below the pond. The defendants' evidence is to the effect that such water as flowed out of the pond when it became full was permitted to flow down the swale with no apparent attempt to control it except on one or two occasions. The evidence is all to the effect that, during the years 1928 and 1929, the water which had theretofore flowed from plaintiff's wells was decreased by the pumping of water from defendants' wells. There is some evidence tending to show that plaintiff's wells and also his so-called springs were affected by defendants' pumping operations as early as 1925, but the evidence touching such matters is very unsatisfactory as applied to the so-called springs and also as applied to the wells prior to the year 1928. Defendants have expended approximately $12,000 in drilling wells, constructing an electric power line, and installing pumps in order that they may secure water with which to irrigate their land. On August 27 and 28, 1928, defendants' Kimball pump was operated continuously for a period of 36 hours discharging 700 gallons per minute. The pump was so operated for the purpose of determining what effect, if any, would be produced upon plaintiff's wells. As the result of such operation, most of plaintiff's wells ceased to flow. The flow returned to normal within a day or two after the pumping ceased. The foregoing statement of the admitted facts and the brief summary of the conflicting evidence, while incomplete, are deemed sufficient to make clear the questions which divide the parties to this litigation.

The complaint in this case was apparently drawn on the theory that the origin and source of plaintiff's right to the use of the water in question should be determined by the law applicable to the appropriation of public water. Such was apparently the theory adopted by the trial court. In my opinion the facts of this case clearly bring it within the doctrine of correlative rights as announced by this court in the case of *Horne* v. *Utah Oil Refining Co.,* 59 Utah 279, 202 P. 815, 31 A. L. R. 883. It will be noted that most of the land here involved was privately owned before the wells in con-

troversy were drilled. In the case of *Wrathall* v. *Johnson et al.*, (Utah) 40 P. (2d) 755, recently decided, numerous cases dealing with underground water are reviewed at considerable length by this court. It is not necessary to repeat what is there said. A brief statement of what I conceive to be the established law in this jurisdiction with respect to the matter in hand will be sufficient: Only public water is subject to appropriation. Such water consists of water on the public domain whether appearing in running streams, in lakes, in artesian basins, or as percolating water, and water flowing through privately owned land in natural channels either above or below the surface of the earth. On the other hand, water which appears in any of the following manners are not public and hence may not be appropriated after the land upon which such water occurs becomes privately owned: Water in ponds, in bogs, in marshes, in artesian basins, in springs arising upon and not flowing from private property, and percolating water generally. It would seem that as a necessary incident to the public ownership of water there must exist in the public or in a prospective qualified appropriator of public water a lawful means of acquiring the use thereof. It is quite generally held that a public easement exists along the course of a natural channel conveying water over or through privately owned land. So also when water is appropriated on the public domain one who thereafter acquires title to such land takes his title subject to an easement in favor of the appropriator to continue to take the water appropriated by him. However, after land passes into private ownership, such land is not burdened with a public easement to maintain thereon or therein a pond, a marsh, a bog, or an artesian basin. In such cases the water is a part of the land upon or within which it is found and belongs to the owner of the land. No right is reserved in the public, or for the benefit of one who desires to appropriate water, to go upon the land of another and appropriate water from a spring arising upon but not flowing from such land. Much less may the public, or any member thereof, lawfully go up-

on privately owned land and there prospect for or appropriate the percolating water therein. No provision is made for the condemning of private property for such purpose. It is quite evident that the case of *Horne* v. *Utah Oil Refining Co.*, supra, proceeds upon the theory that the water of an artesian basin within privately owned land belongs to the landowner. The clear preponderance of the evidence shows that there is an artesian basin subjacent to the greater part of the lands of the parties to this litigation. Such was the finding of the trial court. Upon the authority of the Horne Case and for the reasons more fully stated in the case of *Wrathall* v. *Johnson et al.*, supra, the rights of the parties in the instant case should be measured and determined by the doctrine of correlative rights and not by the law of appropriation.

Thus plaintiff's right to the use of the well water in controversy is bottomed upon the fact that the artesian basin from which he draws his water is subjacent to his land and not because his wells were driven before those of the defendants. It follows that the rights of the defendants in and to the water of the artesian basin are not inferior but are co-equal with those of the plaintiff. Under the rule announced in the Horne Case, the amount of water to which each of the parties is entitled must be measured by the surface area which overlies the basin, provided he put such water to a beneficial use. No claim is here made that the defendants *failed to beneficially use the water which they pumped from* their well. The manner in which plaintiff has irrigated with his well water has apparently been somewhat crude and wasteful, but, the court below having found that such water was by the plaintiff put to a beneficial use, we, as a reviewing court, are not justified in disturbing that finding. It does appear that the practice prevailing in that locality of permitting artesian wells to flow to full capacity during non-irrigating seasons is not necessary and is calculated to seriously lessen the supply of water available for useful purposes. However, no point is made of such fact by either of

the parties to this controversy, and therefore we need not be concerned with that phase of this case.

With respect to the well water, the primary, if not the sole, ground of plaintiff's complaint, is that because of defendants operating their pump the pressure of the water in plaintiff's wells was reduced and at times the water ceased to flow out of the pipe. By the decree appealed from defendants are enjoined from so operating their pump as to interfere with "the natural or normal flow of plaintiff's springs or wells." In view of the fact that defendants' pump draws water from the artesian basin which feeds plaintiff's wells, it would seem to follow that the pumping of any water by the defendants will, in all probability, interfere in some measure with the natural or normal flow of plaintiff's wells. Such seems to be plaintiff's contention, as he offered evidence tending to show that his supply of water began to fail as early as 1916 when defendants began to operate their first pump, and that the decrease of his supply became quite obvious as early as 1925. It will be remembered that plaintiff's wells are located in a swale where the surface of his ground is about 11 feet lower than the surface of the ground where defendants operated their Kimball pump at the time complained of. As a result plaintiff's wells naturally and normally flow out of the pipe while the water in defendants' well naturally and normally stands in the pipe 7 or 8 feet below the surface. If, therefore, defendants may not operate their pumps, they will be deprived of the use of their just proportion of the water in the artesian basin. To hold that defendants have a right to their proportion of the water of the artesian basin and at the same time deny them the right to employ the only available means of using such water would be a farce. Having recognized the doctrine of correlative rights, it necessarily follows that one who possesses a right to water in an artesian basin may withdraw his lawful share thereof through flowing wells, by means of pumps, or other device, even though in so doing he may interfere with the pressure or flow in his neighbor's wells. However, a landowner should be permitted

to interfere with his neighbor's means of securing under-
ground water to the extent, and only to the extent, that is
necessary to secure to each his just proportion of such water.
Any other rule defeats or tends to defeat the entire doctrine
of correlative rights. Applying the foregoing rule to the
case in hand, the defendants should be permitted to operate
their Kimball pump to such an extent, and only to such an
extent, as may be necessary to furnish them with their share
of the water of the artesian basin which is subjacent to their
land and the land of the plaintiff. It may well be that, if
defendants pump their share of the water from the basin,
plaintiff will likewise, at times, find it necessary to pump
some of his water. Such a result is a necessary incident to
the doctrine of correlative rights. If the rights to the corpus
of underground water are correlative, so likewise must the
means of securing the use thereof be correlative. I am not
unmindful of the fact that in many cases it is difficult to
ascertain the extent of an artesian basin and the actual avail-
able supply of water therein. Similar difficulties are en-
countered with respect to underground water which is sub-
ject to appropriation.

In his oral opinion in the instant case, the learned trial
judge indicated that he was unable to ascertain from the
evidence adduced the extent of the artesian basin here in
question or the total amount of available water therein. It
also appears that the parties to this suit were not disposed
to incur the expense and delay necessary to ascertain such
facts. Upon this appeal all of the parties urge us to dispose
of this cause upon the case made. Under such circumstances
we should, if possible, determine the rights of the parties
upon the record before us.

The court below found that the flow of the springs on
plaintiff's land was also interfered with by the operation of
defendants' pump. There is some evidence which tends to
support that finding. It is clear that a substantial portion
of the water which finds its way into plaintiff's drains and
so-called springs comes from the irrigation of the lands in

that vicinity, including defendants' land. Defendants and the other landowners in that vicinity are under no legal obligations to plaintiff to continue to irrigate their lands or to supply water to feed plaintiff's springs and seeps. Obviously, no rights of plaintiff are interfered with if the defendants pump water from their lands which water is the result of the irrigation of such land. After a careful review of the evidence, I am of the opinion that plaintiff has failed to show that defendants by their pumping operations have unlawfully interfered with his so-called springs.

During the course of the trial defendants through their attorneys stated that if the "court finds that there is an unlawful interference with any of the flow of Justesen's wells, or either of them, that we ask for the permission to replace such water * * * by either driving the plaintiff's wells deeper, having the permission to determine the log of the country at his wells, or to install an electric pump at that place and to operate it at the defendants' expense." So far as appears the offer was not withdrawn. Plaintiff did not, and so far as appears, was unwilling to accept the offer. In the light of such offer, some further observations are pertinent. Even though the doctrine of correlative rights be repudiated and it be held that plaintiff has acquired by appropriation the right to the water which has been flowing from his wells, still he should not be permitted to prevent others from using any of the excess water of the basin. The clear preponderance of the evidence shows that the supply of water within the basin is in excess of plaintiff's claim conceding that his rights have been acquired by appropriation. Plaintiff has been receiving from his wells only from 4 to 7 gallons of water per minute. For a period of 36 hours defendants pumped 700 gallons per minute without exhausting the water in the basin. The nominal flow of plaintiff's wells returned within a short time after the pumping ceased. It is the settled law in this jurisdiction not only that acquired water rights be fully protected but also that all available water be put to a beneficial use. Under the law of appropria-

tion one acquiring the right to the use of public water is entitled to only such water as he beneficially uses. So long as an appropriator receives his water at his place of use without additional expense to him he has no just cause to complain merely because the method or means of delivering the water is changed. *Salt Lake City v. Gardner,* 39 Utah 30, 114 P. 147; *United States v. Caldwell (Upper Blue Bench Irr. Dist.),* 64 Utah 490, 231 P. 434. In the instant case the well in which defendants installed and operated their pump at the time complained of was about 1,900 feet distant from plaintiff's well. The surface of the ground where defendants' pump was installed is about 11 feet higher than is the surface of the ground where plaintiff's wells are located, so that water will readily flow by gravity from defendants' pump to plaintiff's place of use. If a pipe line were constructed underground from defendants' pump to plaintiff's place of use and such water as plaintiff may be entitled to receive were delivered to him through such pipe line during the time defendants' pumps are being operated and until plaintiff's wells again begin to flow, it would seem that plaintiff's rights would be fully and amply protected. It may be that this court is without authority to make such an order in the absence of the consent of the parties, but, even if it be held that plaintiff has acquired rights to the water in controversy by appropriation, an injunction should not issue depriving defendants from operating their pump where plaintiff may, without cost to himself and without any injury to his premises, receive the water at his place of use.

In my opinion the judgment appealed from should be reversed. The taxable costs incurred in this court and in the court below should be taxed one-fifth thereof to plaintiff and one-fifth thereof to each of the defendants. This cause should be remanded to the district court of Sanpete county, with directions to that court (in the absence of the parties agreeing to some such an arrangement as that above indicated) to permit the parties to present further evidence touching the amount of water that each of the parties to this

proceeding is entitled to draw from the artesian basin, and also touching the manner in which defendants may operate their pump so as not to cast any unnecessary burden on the plaintiff in securing his proportion of the water, and for such other proceedings not inconsistent with the views here expressed as may be proper.

FOLLAND, Justice (dissenting).

I concur in the opinion of Mr. Justice ELIAS HANSEN. The views I entertain on the subject of underground water were expressed in the case of *Wrathall* v. *Johnson* (Utah) 40 P. (2d) 755.

MOFFAT, J., did not participate herein.