## RIORDAN v. WESTWOOD et al.

No. 7109.   Decided March 11, 1949.   (203 P. 2d 922.)

See 67 C. J., Waters, sec. 412; 56 Am. Jur. 741. Constitutionality of statute affecting riparian rights, note, 56 A. L. R. 277.

*Grover A. Giles,* Atty Gen. and *Edward W. Clyde,* Special Asst. Atty. Gen., for Ed H. Watson, State Engineer.

*Hammond & Hammond,* of Price, for appellant Westwood.

*Weston L. Bayles* and *Knox Patterson,* both of Salt Lake City, for respondent.

WADE, Justice.

The defendants, Westwood and the State Engineer, appeal from the decision of the district court which refused to approve an application by the defendant Westwood to the State Engineer's Office to appropriate .25 cubic feet per second of water. The state engineer approved this application over the protest of plaintiff Mrs. Riordan who is the owner of the lands on which the applicant proposes to divert and appropriate the waters in question. Plaintiff appealed from the engineer's decision by commencing this action in the district court and both the state engineer and the defendant Westwood appeal from that decision.

The matter was tried on a stipulation of the facts which was adopted as a part of the court's findings of fact. The substance of the stipulated facts which are material to this case are as follows: That for 80 years prior to the commencement of this action plaintiff and her predecessors in interest have owned the land in question; that a spring area has existed on such lands which rises in a conglomerate of sand, clay and sandstone in a ravine at the foot of sand stone cliffs just north of the town of Moab, approximately 100 feet higher in elevation and 500 feet north of any cultivated lands of the plaintiff and that no water from said spring area has ever found its way to such lands except in times of heavy rains. The heavy rains are not involved in this action. For at least 20 years prior to the commencement of this action there has been sufficient water in this spring area to support the growing of a few brush, some small patches of native grass and a few scrubby cottonwood trees. The water sufficient to sustain this growth has come from this spring area other than the downpour in time of heavy rains. During the prolonged wet seasons the water at such spring would rise to the surface sometimes in quantity sufficient to form a small pond but never sufficient to flow on top of the ground in any channel except temporarily from the downpour of rains.

Within 6 months prior to February 28, 1944, Westwood, believing that such spring area was on public lands, excavated a channel about 18 inches wide and 6 inches deep for a distance of about 50 feet in the conglomerate materials around the spring area and then tunnelled about 25 feet at which point he contacted water which flowed in said channel. For the first 10 days about .25 of a cubic foot per second of water flowed therefrom, but after that time it diminished to about .05 of a cubic foot per second, which still continues to flow for a distance of about 50 feet where in sinks into the soil. After striking this flow of water and still believing that it was located on public lands, Westwood filed in the office of the state engineer an application to appropriate such water to which plaintiff objected and after a hearing thereon the state engineer approved the application, which on appeal was reversed by the district court. Neither plaintiff nor her predecessors in interest have ever filed an application with the state engineer for the appropriation of any water from this spring area, nor have they made any beneficial use of such waters or done any development work thereon. On these stipulated facts the district court refused to approve Westwood's application to appropriate these waters.

The question here presented is whether the right to the use of these waters may be acquired pursuant to our statutes governing the appropriation of public waters. In other words we must determine whether these are public waters of the state, and therefore subject to appropriation. If they are the trial court must be reversed. If on the other hand they belong to the owner of the soil through which they pass they are not subject to appropriation. In that case the decision must be affirmed. When the defendant Westwood located these waters the land where they were discovered was not part of the public domain but had long since been reduced to private ownership. Prior to the discovery by him no one had ever developed or used these waters by artificial means. The record shows that Westwood tunnelled

about 25 feet "at which. point he contacted water which flowed in said channel," whether it was diffused through the soil around the tunnel and drained therefrom into it or whether he directly contacted it as an underground flowing stream does not appear, but it does appear that it became a stream upon digging the tunnel. Prior to the digging of the tunnel these waters did not come to the surface in the form of a stream nor did they ever flow on the surface in a natural channel, the only evidence of their existence prior to that time was that there was a spring area, how large is not disclosed, which supported some grass, bushes and trees, and during the time of heavy rains sometimes a pond was formed on the surface. Where the waters came from and where they went from the spring area does not appear from the record, whether they were used up by the plant life which they supported, or evaporated into the air or were diffused in the soil so widely that their course could not be traced, or whether a part of all three of the suggested methods contributed to their disappearance the record does not disclose. But it does appear that except in times of heavy rain fall when the water flows over the surface, none of these waters ever reach the plaintiff's cultivated lands which are 500 feet from the spring area.

From the earliest history to the present time this court has recognized that the right to the use of public waters of this state could be acquired by diversion and beneficial use. *Monroe* v. *Ivie,* 2 Utah 535. At first no formal proceedings were required in order to acquire such right but in 1897 the legislature provided for the posting of a notice of intention to appropriate, and thereafter recording the same. Laws of Utah 1897, Chapter 52, Section 8. In 1903 comprehensive legislation was enacted creating the Department of the State Engineer, and requiring that an application to appropriate be filed in that department in order to make future appropriations of water in this state. See *Deseret Live Stock Co.* v. *Hooppiania,* 66 Utah 25, 239 P. 479; *Wrathall* v. *Johnson,*

86 Utah 50, 40 P. 2d 755. See Laws of Utah 1903, chapter 100 wherein the following sections appear:

Sec. 34.

"Rights to the use of any of the unappropriated water of the State may be acquired by appropriation, in the manner hereinafter provided, *and not otherwise.* The appropriation must be for some useful or beneficial purpose, and, as between appropriators, the one first in time shall be first in right." (Emphasis ours.)

Sec. 47.

"The waters of all streams and other sources in this State, whether flowing above or underground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

Sec. 49.

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this State."

This court throughout its history has recognized that percolating waters are not public waters but belong to the soil through which they pass and are the property of the owner thereof, and are not the subject of appropriation. See *Sullivan* v. *Northern Spy Mining Company,* 11 Utah 438, 40 P. 709, 30 A. L. R. 186; *Crescent Mining Co.* v. *Silver King Mining Co.,* 17 Utah 444, 54 P. 244, 70 Am. St. Rep. 810; *Herriman Irr. Co.* v. *Butterfield M. & M. Co.* 19 Utah 453, 57 P. 537, 51 L. R. A. 930; *Willow Creek Irr. Co.* v. *Michaelson,* 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687; *Herriman Irr. Co.* v. *Keel,* 25 Utah 96, 69 P. 719; *Garns* v. *Rollins,* 41 Utah 260, 125 P. 867, Ann. Cas. 1915C, 1159; *Roberts* v. *Gribble,* 43 Utah 411, 134 P. 1014; *Stookey* v. *Green,* 53 Utah 311, 178 P. 586; *Peterson* v. *Eureka Hill Mining Co.,* 53 Utah 70, 176 P. 729; *Peterson* v. *Lund,* 57 Utah 162, 193 P. 1087; *Deseret Live Stock Co.* v. *Hooppiania,* supra; *Midway Irr. Co.* v. *Snake Creek Mining & Tunnel Co.,* 8 Cir., 271 F. 157, affirmed 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423; *Horne* v. *Utah Oil Re-*

*fining Co.,* 59 Utah 279, 202 P. 815, 31 A. L. R. 883; *Silver King Consol. Min. Co.* v. *Sutton,* 85 Utah 297, 39 P. 2d 682; *Wrathall* v. *Johnson,* supra; *Justesen* v. *Olsen,* 86 Utah 158, 40 P. 2d 802.

However, there are well established exceptions to this rule. Thus in the early case of *Sullivan* v. *Northern Spy Mining Co.,* supra, we held that where a man went on the public domain and developed a water hole where the percolating waters gathered, and placed them to a beneficial use, the owner who later acquired the property took the same subject to appropriator's vested right to the use of this water. We have also repeatedly held that the appropriators of the waters of natural streams acquired a vested interest in the source of the waters of such streams which was percolating through the soil of the lands which belong to the public domain at the time when the appropriation was first made. See *Peterson* v. *Wood,* 71 Utah 77, 262 P. 828; *Peterson* v. *Lund,* supra; *Rasmussen* v. *Moroni Irr. Co.,* 56 Utah 140, 189 P. 572; *Cole & Cole* v. *Richards Irr. Co.,* 27 Utah 205, 75 P. 376, 101 Am. St. Rep. 962. We have also held that the underground flow of the waters of a stream which percolate slowly through the materials under the stream are a part of the stream and do not belong to the person who owns the lands through which they pass. *Howcroft* v. *Union & Jordan Irr. Co.,* 25 Utah 311, 71 P. 487.

Our concept of what was and what was not percolating waters has changed greatly since that term was used in the early cases. In those cases we described percolating waters as not, "naturally flowing in a stream with a well-defined channel, banks, and course." *Crescent Mining Co.* v. *Silver King Mining Co.,* supra [17 Utah 444, 54 P. 245]. Again percolating waters were defined as "percolating through the soil, or flowing in a subterranean stream, having no defined or known channels, courses, or banks." *Willow Creek Irr. Co.* v. *Michaelson,* supra [21 Utah 248, 60 P. 944]. Thus our original concept of percolating waters was all underground waters which were not flowing in well defined

or known channels with courses and banks. The legislature in 1903 enacted section 47 above quoted, which provided that all waters "whether flowing above or underground in known or defined channels" are the property of the public. Originally, the concept seems to have been that all underground water was percolating water except where it flowed through the ground in a definite channel with a definite course and was surrounded by banks. The statute omitted the words "courses and banks,", which probably eased the emphasis on there being a definite course through which a stream of water flowed.

Until 1935 the decisions of this court treated the waters of artesian basins as percolating waters, and as such the ownership went with the owner of the ground where such waters were located and were not considered to be subject to appropriation. Since such basins occupied a subterranian area owned by many persons so that one such owner could by withdrawing more than his share of the waters of the basin deprive others of their proportionate share thereof, we recognized that this relationship required regulation and for this purpose we adopted what is known as the correlative rights and beneficial use theory. See *Horne* v. *Utah Oil Refining Co.*, supra, and same case *Glover* v. *Utah Oil Refining Co.*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900. The first of those cases was decided in 1921, and that was recognized as the law of this state until the decision of *Wrathall* v. *Johnson,* supra, and *Justesen* v. *Olsen,* supra, in 1935. These cases held that the waters of artesian basins are underground waters "flowing * * * in known or defined * * * channels" as that term is used in section 100-1-1, R. S. U. 1933, which with slight amendments is the same as Section 47, Chapter 100, Laws of Utah for 1903, quoted above. In the *Wrathall* case there were four opinions and although all concurred with the result, as far as the questions herein discussed are concerned, the court divided two to three. Mr. Justice Moffat wrote the main opinion and Mr. Justice Ephraim Hanson concurred without com-

ment and Chief Justice Straup also concurred in a separate opinion. These opinions hold that the doctrine of percolating waters, and correlative rights have no application to artesian basins such as was involved in that case, but that such waters were subject to appropriation and the doctrine that the first in time is the first in right governs. From such holding, although concurring with the result, Justices Elias Hansen and Folland wrote vigorous and exhaustive dissents. The same division of opinion existed in the *Justesen* case which was handed down a few days later, although Mr. Justice Moffat did not participate therein, being replaced by District Judge Bates, who wrote the prevailing opinion, which was concurred in by Justice Ephraim Hanson and Chief Justice Straup, and dissented to by Justices Elias Hansen and Folland.

Mr. Justice Moffat who wrote the main opinion in the *Wrathall* case construed section 100-1-1, to mean that all flowing waters in this state whether above or underground are the property of the state subject to all existing rights to the use thereof. Chief Justice Straup who concurred therewith and also wrote a separate opinion had this to say on the construction of that statute [86 Utah 50, 40 P. 2d 790]:

"* * * There is some confusion in the adjudicated cases and texts as to the meaning of the term 'percolating waters,' or at least in the sense in which such term is used by them. *I use the term as diffused waters in lands privately owned, percolating or seeping through the ground, moving by gravity in any or every direction along a line of least resistance, not forming any part of a stream or other body of water either surface or subterranean, and, as far as known, not contributing or tributary to a flow of any defined stream or body of water. In other words, mere diffused waters in privately owned lands, not flowing in any defined or known stream, either surface or subterranean, or not forming a part of a body of water either surface or subterranean, belong to the owner of the soil or land and may be used and disposed of by him as he sees fit, so long as such waters are on or in his lands;* if however, such waters percolate or seep from his land on or in and are diffused with lands of another, such waters are lost to the former and he may not pursue or reclaim them on or in lands of such other; nor in such case may such other acquire or claim any right or interest in diffused waters

on or in lands of the former, so long as they are on or in his lands. Such waters so on or in lands privately owned may not, by appropriation or otherwise, be acquired by another, except by grant. To hold otherwise necessitates, as I think, the overruling of a number of prior decisions of this jurisdiction. Such waters are not 'public waters' as defined by our statute, and hence are not subject to appropriation by another. On the other hand, waters flowing in a known or defined stream, either surface or subterranean, or in or forming a part of a body of water either surface or subterranean, are by the statute, when considered in all its parts, characterized as 'public waters,' and thus subject to appropriation; * * *". (Emphasis ours.)

All of the opinions in those cases frankly recognized that those decisions were a departure from the previous concept of what had been considered percolating waters, and that they brought under the statutes governing appropriation of water much underground water which had previously been considered to belong to the owners of the land and not subject to appropriation. Several of those opinions made suggestions to the legislature, which was then in session, of necessary or desirable legislation to meet this change in concept. Accordingly the legislature did amend and enact laws to meet these changes. See Laws of Utah for 1935, chapters 104 and 105. Two changes in the previous law have a bearing on our present problems. Section 100-1-1, R. S. U. 1933, previously section 47, chapter 100, Laws of Utah 1903, and which as amended is now section 100-1-1, U. C. A. 1943, contains the following provisions:

"All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof."

Section 100-3-1, R. S. U. 1933, previously section 34, Laws of Utah 1903, and which as amended is section 100-3-1- U. C. A. 1943, contains the following provisions:

"Rights to the use of the unappropriated public waters in this state may be acquired only as provided in this title. No appropriation of water may be made and no rights to the use thereof initiated and no notice of intent to appropriate shall be recognized except application for such appropriation first be made to the state engineer in the manner hereinafter provided, and not otherwise. * * *"

In addition to the foregoing changes to meet the changed concepts since the *Wrathall* case the legislature has made the following changes with reference to underground waters: Section 100-3-5, R. S. U. 1933 in 1941 was amended to authorize the State Engineer to issue a permit to drill wells after an application to appropriate had been filed; section 100-3-22 was enacted in 1935 requiring every person boring or digging wells or tunnels for the purpose of appropriating underground waters to report the result thereof to the State Engineer; section 100-3-23 enacted in 1935 granting to a junior appropriator the right to replace the waters of a senior appropriator at the sole cost of the junior appropriator, and section 100-5-12, enacted in 1935 requiring all claimants to the use of underground waters to file with the State Engineer notice of such claim within one year after the approval of that act.

The various opinions in the *Wrathall* and *Justesen* cases show a marked divergence on the meaning of the above quoted statutes prior to the amendments. But since the amendment to section 100-1-1, it is clear that the legislature intended, as far as it was legally possible, to declare all waters of the state whether under or above the surface of the ground and whether flowing or not, to be public property subject to the existing rights of the use thereof. Such has probably always been the law of this state regardless of this amendment. Of course the legislature cannot by such an enactment change from private to public ownership waters which by their nature were a part of the soil and as such belonged to the owner of the land on which they are found. Our concept of what waters were a part of the soil and as such belonged to the owner of the land has greatly changed since the early settlement of this state, and the question of what water is subject to appropriation must be determined on our present standards and concepts and we must treat that question as though our concepts and standards had always been as they are now. The amendment to section 100-3-1, supra, and the additional enactment definitely in-

dicate that in the future no right to the use of any public waters of this state can be acquired without compliance with the statutory provisions governing the acquisition of such rights. Appellants concede that under the concept we had what constituted percolating waters and the statutory provisions governing the appropriation of public waters prior to 1935 the waters in question would not be the subject of an appropriation but they contend that under the changed concepts and standards and statutory provisions these waters are public waters and subject to appropriation.

Appellants contend that the theory that percolating waters are a part of the soil and belong to the owner thereof is out of harmony with our system of appropriation, and since the 1935 changes should be so treated. They contend that such waters are always moving and therefore transitory in their nature and therefore are the same as surface and underground streams and that by their nature they cannot be the subject of private ownership. They further argue that the contrary theory is a part of the reparian rights theory which has never been recognized or followed in this state; that such doctrine is contrary to the appropriation and beneficial use doctrine in that the owner can allow percolating waters to be entirely wasted when they should be used for the development of the state. They further contend that while this court has many times stated in the course of opinions that percolating waters belong to the owner of the soil such statements were mere dicta and not binding on the court now.

Some of the cases clearly are dicta. See *Sullivan* v. *Northern Spy Mining Co.*, supra. There are other cases where this question was raised and necessary for the decision, but in which the same result could have been reached under the appropriation theory because the owners of the land also first used and appropriated the waters for a beneficial use. See *Crescent Mining Co.* v. *Silver King Mining Co.*, and other cases involving waters discovered in tunnelling and placed to a beneficial use by the owner of the land. But

there are other cases where the decision was necessary in order to reach the result which the court did reach. See *Willow Creek Irr. Co.* v. *Michaelson,* supra, where after the land was privately owned a marsh or bog developed in a hollow from natural causes and for three years ran into the ditch of and was used by the Willow Creek Irr. Co., then the owner of the land made another ditch and took the water away where it could not be used by that company. The court held that since this water developed after the land was private property, and although the company had been using it for three years, still the company got no right to the use thereof because it was percolating waters and belonged to the soil through which it passed. This case was not dicta and if not followed it will have to be overruled.

The rule that percolating waters are a part of the soil and belong to the owner thereof, as long as they remain in his soil, while generally adopted by the same courts which follow the riparian rights doctrine, is not a part of that doctrine and to some extent is contrary thereto. Under the riparian rights doctrine the owner of the land has no owner-ship of the waters of the stream which runs past his land, but does have the right to have it continue to flow sub-stantially in accordance with nature, and must continue to allow it to run through other lands in the same manner. But under this percolating water doctrine, the owner of the lands through which it passes becomes the owner of the water as long as it is on his land, and may capture and use it or extract the minerals out of it, which it brings into his land, but after it is gone from his land he has no further rights therein. See *Utah Copper Co.* v. *Montana-Bingham Consol. Mining Co.,* 69 Utah 423, 255 P. 672; *Utah Copper Co.* v. *Stephen Hayes Estate, Inc.,* 83 Utah 545, 31 P. 2d 624. And as long as it remains in his land the owner can prevent any one else from taking such waters from his land. In other words, under that doctrine, the owner of the land does not have any right to the waters percolating through the soil before they come into his land nor after they depart

therefrom, but while they are in his land they are a part of the soil and belong to him, and he can do with them, during such time, as he sees fit. Thus the court treats these waters the same as any other transitory thing, while it is captured and in his possession he has the ownership thereof, but when it gets out of his possession he loses the ownership, and it treats percolating waters while in the soil as captured and in the possession of the owner of the soil.

The doctrine that percolating and diffused water is a part of the soil and belongs to the owner thereof is in some respects similar to the doctrine of appropriation and beneficial use. Where through natural conditions water at a certain place is continuously diffused and percolates through the soil near enough to the surface to subirrigate the ground and cause beneficial plant life to grow thereon, such condition by nature constitutes a beneficial use of the water, and thereby enhances the value of the land and the effect thereof is not unlike the artificial diversion and beneficial use of such waters. To the extent that the water is necessary to produce beneficial plant life on the surface it is not wasted but is used without artificial diversion in its natural state for a beneficial use.

The construction placed on section 100-1-1, R. S. U. 1933, in the *Wrathall* case to the effect that all flowing waters, whether above or underground belong to the public subject to all existing rights to the use thereof tends strongly to eliminate the rule that any percolating waters belong to the soil and are owned by the owner thereof. Also in the *Justesen* case we definitely indicated that the idea that percolating waters are a part of the soil is in conflict with our idea that moving waters could be owned by the owner of the soil as a part thereof wherein we said [86 Utah 158, 40 P. 2d 805] :

"There can be no more ownership of water moving through the soil than there can be of ownership of water moving across the surface. It is evasive and constantly changing. In either case any use must of necessity be in its nature usufructory only."

But plaintiff's counsel repeatedly says that there is no evidence that this water is moving. He seems to contend that the same water remains in this ground from year to year. Such a claim is so far from known facts of the nature of water and its reactions in the soil that we cannot believe that it is made seriously. But the stipulation is not lacking in facts which demonstrate that such contention is incorrect. After the tunnel was made the water flowed in a stream for a short distance then disappeared into the ground. Since as plaintiff's counsel repeatedly says in his brief, water will run downhill, and not uphill, we must judicially know that this water does not after sinking into the ground at a lower level than the tunnel circle around through the earth and back up to the tunnel and run out again.

There is much weight to the contention that percolating waters cannot be a part of the soil and belong to the owner thereof because it is constantly changing. It cannot be a part of the soil like a rock or other materials of which the soil is composed because while there may be water constantly in the soil it is not the same water which is there from day to day. However the *Wrathall* and *Justesen* cases did not purport to overrule the *Horne* case or the doctrine of relative rights, nor the doctrine that percolating waters are a part of the soil and belong to the owner thereof. The distinction suggested between the *Horne* case and the later cases, that the basin was much larger in the later cases, is no reason for applying a different rule in the two cases. But there is no difficulty in distinguishing the *Wrathall* and *Justesen* cases from the situation presented here. The waters in an artesian basin, while not flowing in a channel surrounded by banks and walls does move as a body slowly under a wide area of impervious strata. But it is greatly different from a small spring area of wet ground with water near the surface which is widely diffused through the soil through which it slowly percolates. What is said in those cases has little bearing on such problem.

Chief Justice Straup in his concurring opinion in the *Wrathall* case carefully defined what he meant when he used the term "percolating waters." See quotation above. While some of the conditions of that definition, if interpreted strictly are not here presented, it is hard to conceive of a situation which would meet that definition more fully than this one does.

In an arid state like ours it is very important that all of the waters be used in the most beneficial and economical way possible and that none shall be wasted. It is also important that the owners of the land shall not be disturbed in the beneficial use of the waters on their land in accordance with their previous custom and conditions. That is true whether the use is through an artificial diversion of the water from its natural course or whether it is the result of water coursing through the soil and producing a beneficial result in its natural state without an artificial diversion. Where, as here, in its natural state water is diffused and percolates through the soil so near the surface that without artificial diversion or application it produces plant life and thereby beneficially affects the land, and where its course cannot be traced onto the lands of any person other than the owner of the land where it is found, such water is percolating waters and as such are a part of the soil, they are not public waters, and the right to the use thereof cannot be acquired by appropriation under our appropriation statute. Such has always been the law of this State and still is.

If such were not the case then there would be much meadow land and other lands that are so situated that they are naturally sub-irrigated through percolation from higher grounds which could be appropriated and drained and the waters carried onto the land of strangers even though the use of such waters on the lands in accordance with their natural course would be much more beneficial and economical than it would be if diverted from their natural course onto the lands of others. If such waters are public waters and

subject to appropriation then it would be impossible for the owner of the land on which they appear to make the appropriation for use on his lands in their natural state because such use does not require an artificial diversion or use which is required in order to obtain the right to the use of waters by appropriation. It would also mean that every land owner who has a naturally wet place on his land would have to make application to appropriate such waters and unnecessarily divert the water from its natural course in order to preserve his right to the use thereof even though it would be more economical and beneficial to allow it to proceed in accordance with nature.

In *Adams* v. *Portage Irr., Reservoir & Power Co.*, 95 Utah 1, 72 P. 2d 648, we recognized the right of the owner of the land on which a spring arose to use sufficient of such water to water his sheep as he had done for more than 40 years. This in spite of the fact that we held that he had not acquired such right as an appropriator thereof because he had not diverted it from its natural course through any regular artificial diversion works and had not continuously used the same. In so holding we recognized that the right to the use of water could be established in the owner of the land through which it coursed by means other than by the generally recognized and now statutory method of artificial diversion and beneficial use. There the use was artificial, but there was no established diversion point except as the animals came to the stream and drank therefrom. But the use to which the water was put was of great benefit to the owners of the land and the right to such use sanctioned, though all of the waters which reached the diversion point below had been appropriated by others. Here there is no artificial diversion or artificial use but in its natural state the water produces a beneficial effect on the land; such waters as these have never been recognized as public waters of this state but have always been considered as a part of the land through which they course and as belonging to the owner of the soil.

In this state the beneficial use of all of its waters is of paramount importance. Waters, even though diffused and percolating through the soil, which do not sustain plant life or otherwise beneficially affect the land through which they course are not necessarily a part thereof ■ and to the end that they might be placed to a beneficial use should belong to the public and be subject to appropriation the same as other waters. It is clear that a part of the waters in question produce a beneficial plant life thereon. But such plant life is very limited; it consisted of only a few brush, one or two patches of native grass and one or two scrubby cottonwood trees. To sustain such plant life would probably require very little water, perhaps if defendant took all the water which he could it still would not cut off the water which supplies this plant life. It seems probable that there is more than sufficient water in this spring area, small as the stream is, to sustain this plant life. Such being the case, the application must be approved. It is not necessary that it be established that there is unappropriated waters in this source in order to justify the approval of the application to appropriate, all that is necessary is that there is reasonable ground to believe that such is the case. *Eardley* v. *Terry,* 94 Utah 367, 77 P. 2d 362; *Little Cottonwood Water Co.* v. *Kimball,* 76 Utah 243, 289 P. 116; *Rocky Ford Irr. Co.* v. *Kents Lake Irrigation Co.,* 104 Utah 202, 135 P. 2d 108; *Whitmore* v. *Welch,* 114 Utah 578, 201 P. 2d 954; *Lehi Irr. Co.* v. *Jones,* 115 Utah 136, 202 P. 2d 892. But the approval of this application does not mean that it is adjudicated that there is unappropriated waters at this source. The applicant still has to demonstrate that such is the case before a certificate of appropriation can be issued to him.

Plaintiff contends that in going on her ground to discover this water applicant was a trespasser and that a right to the use of water cannot be initiated as against the owner of the land at the proposed diversion point by a trespass. *Prentice* v. *McKay,* 38 Mont. 114, 98 P. 1081 and ■

*Marshall* v. *Niagara Springs Orchard Co.*, 22 Idaho 144, 125 P. 208. That doctrine although several times discussed has not been approved by this court. In *Patterson* v. *Ryan,* 37 Utah 410, 108 P. 1118, although a decision of that question was not necessary in that case, we indicated that such was not the law of this state. In *Whitmore* v. *Salt Lake City,* 89 Utah 387, 57 P. 2d 726, we discussed the question, cited the *Patterson* case, supra, but held that it was not necessary to decide the question there. In *Adams* v. *Portage Irr., Reservoir Power Co.,* supra, we stated that the lower court had allowed defendant more than it was entitled to since it was a trespasser on the land of plaintiffs' but nevertheless allowed defendants to continue to establish its diverting works on plaintiffs' land in accordance with the regulations to which plaintiffs did not object. In *State* v. *Superior Court,* 70 Wash. 442, 126 P. 945, the applicant to appropriate made extensive surveys over the land of the contestant, drilled test holes thereon, posted notices at the proposed diversion point, and finally after several years moved in with teams and scrapers and commenced the construction of a reservoir on the land of the protestant all without first obtaining the consent of the owners of such lands. The court however allowed the applicant to condemn the land on which to construct a reservoir, holding that the fact that applicant had trespassed in posting his notices, did not nullify its right to appropriate the water. In so holding the court emphasized the fact that the ground was not occupied and no one objected to the entry thereon.

Here the parties stipulated that the defendant went onto the plaintiff's land under the mistaken belief that it was government land and not privately owned. If it were public land he would not have been a trespasser. There is no indication that he acted in bad faith, or that he did any damage to the land or that any one objected to his entry thereon, or that under the surrounding conditions he should have known that any one would have any objections thereto. Under such

circumstances although he was a trespasser, we hold that his application was not void.

Had defendant been notified or had reason to believe that this land was privately owned it would have been his duty to proceed in accordance wth Section 100-3-19, U. C. A. 1943, before entering upon the land. That section authorizes an applicant to obtain a court order to that effect where the owner refuses him the right to enter. Had he deliberately gone onto the plaintiff's land knowing that he was committing a trespass it might well be that such trespass would nullify his right to appropriate this water but under the circumstances here disclosed such is not the effect.

Of course the applicant cannot even under this decision enter the lands of the plaintiff to further see if he can develop this water right without either getting permission from the plaintiff or condemning a right of way over the land and paying for all damages which he causes therein.

The judgment of the trial court is vacated and the matter is remanded for further proceedings in accordance with this decision. Each party shall bear his own costs.

McDONOUGH, J., concurs.


PRATT, Chief Justice (concurring in part; dissenting in part).

I am of the opinion that the water in controversy in this case, is not shown to be the subject of appropriation. It is not public water. The stipulated facts show nothing more than sufficient water on plaintiff's land to maintain the land in its natural state as to foliage. There is no showing of any flow, channeled or otherwise; no showing of any lake; nor any showing of an artesian basin. Call them percolating waters, if you desire, or diffused waters, there is not enough movement to them to carry them from one part of plaintiff's land to another, not to mention the fact that they do not naturally reach defendant's land. For all

we know, the consumption of the water by the natural foliage uses up all water of practical value from the standpoint of quantity.

I don't think an owner of land is in a comparable position to an owner of dehydrated food. He doesn't own just the solids. It is not exaggeration to say that the naturally green condition of the land may have been a big inducement to its use or acquisition. If that naturally green condition is due to conditions purely local to that land, I think the owner owns that condition. The prevailing opinion recognizes this, and with that I agree. To hold otherwise seems to mean that each purchaser of land must start digging around to see what makes his land green, and even though he finds it merely slightly damp, he must initiate proceedings to keep it that way, or else suffer its dehydration at the hands of others.

The burden should be upon the other party. Let the latter show that the water upon the owner's land is part of the accepted classes of public waters—flowing waters percolating and/or channeled, above or below the surface, or a lake or an artesian basin; and, in making that showing the word "flowing" should mean a substantial flowing, not just an insignificant rise and fall in diffusion incident to the increase or decrease of rainfall.

As the stipulated facts in this case do not show any condition, I have designated above as flowing or as a lake or basin, I believe the decision of the lower court should be affirmed. However, as a majority do not agree with me as to terminating this matter now, I concur in the disposition of the case as directed by the prevailing opinion.

WOLFE, Justice (concurring in part; dissenting in part).

I concur with the opinion of Mr. Justice Latimer. I shall add one further observation. In legal concept all waters of

this state, surface or underground, whether flowing in known or defined channels, whether in underground or surface basins, or whether percolating through public or private lands, not yet appropriated regardless of the existing procedure for appropriation are, and have always been, public waters. When the settlers first came to this state they took the land and the necessary water to make it fruitful. The waters were free for everyone to enjoy beneficially. And in that status the waters of this state remain today except where they have been appropriated. As the state grew and was developed, the legislature at various times concerned itself with different categories of public waters by extending to them certain statutory requirements in order to appropriate said waters rather than to leave them to appropriation by diligence in placing them to beneficial use. The first of these times was in 1903 when the legislature gave the state engineer administrative jurisdiction over all the waters of all streams and other sources in the state flowing above or under the ground in known and defined channels. Chapter 100, Laws of Utah 1903. Later in 1935 the legislature desiring to bring the balance of the public waters of this state under the control of the state engineer, enacted Sec. 100-1-1, U. C. A. 1943, which declared that all waters in this state, whether above or under the ground, are the property of the public, "subject to all existing rights to the use thereof." The legislature did not by a declaration, make public what were previously non-public waters. It simply extended to all public waters the necessity of application to the state engineer in order to appropriate, and made such appropriation subject to all existing rights. The above view, which I think is the correct one, avoids any question of the constitutional right of the legislature to "declare" private waters to be public. They were always public until appropriated by diligence or by application, when the latter was made the necessary method of appropriation.

I am not unmindful of the several opinions of this court which have stated that percolating waters located on private

lands were private waters and not subject to appropriation; that they were an integral part of the soil. See the cases cited by Mr. Justice Wade. Most of those statements were dicta. But in two cases there was a square holding, *Willow Creek Irr. Co.* v. *Michaelson,* supra, and *Deseret Live Stock Co.* v. *Hoopiania,* supra. Even as to those two cases in one of them the percolating waters on private lands had been put to a beneficial use and hence a diligence right had been obtained. They were public waters in regard to which the statute had not given the state engineer administrative jurisdiction and had not required an application to appropriate, and hence those private owners through whose land the waters percolated could obtain diligence rights in such water without application the same as diligence rights could be obtained in surface waters before the enactment of Chapter 100, Laws of Utah 1903. In every instance, with one exception, as far as can be determined, the land owner had put the percolating water to a beneficial use, and by that method obtained a diligence right.

The one case in which this court held that percolating waters on private lands belonged to the owner of the land, where the owner had not put the same to beneficial use before claimed by another was *Willow Creek Irr. Co.* v. *Michaelson,* supra, decided in 1900. There the defendant had suffered water from a bog on his property to run off into the creek of the plaintiff irrigation company and to be used by the plaintiff for a period of three years before the defendant ever attempted to make any use of the water. The court defined percolating water as

"water * * * percolating through the soil, or flowing in a subterranean stream, having no defined or known channels, courses, or banks." [21 Utah 248, 60 P. 944.]

Since that time this court's concept of what is percolating water has been narrowed. Mr. Chief Justice Straup in *Wrathall* v. *Johnson,* supra, used the term to mean

"diffused waters in lands privately owned, percolating or seeping through the ground, moving by gravity in any or every direction

along a line of least resistance, not forming any part of a stream or other body of water either surface or subterranean, and, as far as known, not contributing or tributary to a flow of any defined stream or body of water." [86 Utah 50, 40 P. 2d 790.]

Guided by the latter definition, the waters flowing from the bog in the *Willow Creek* case were not percolating waters since they did contribute to the flow of the Willow Creek.

I agree with Mr. Justice Latimer that there is no evidence that the waters on Jessie Riordan's land were in any way appropriated by her putting the same to a beneficial use; hence she had no diligence right to the waters in question which was preserved by the clause, "subject to all existing rights to the use thereof."

LATIMER, Justice (concurring in part; dissenting in part).

I concur with that part of the prevailing opinion which holds the cause should be remanded for further proceedings. I dissent, however, from that portion which holds that all of the developed waters are not subject to appropriation.

The author of the prevailing opinion in his attempt to save what is considered vested water rights announces some concepts of water law with which I may subsequently disagree, but which I do not answer now because they are not involved in this litigation. We are here dealing with underground waters, and I have grave doubts that an artificial diversion is an absolute requisite to a right to use. However, this question is not before us as there has never been any attempt on the part of the plaintiff to use the water for a beneficial purpose. Accordingly, I reserve for future consideration any discussion as to what right an owner of land might acquire in underground waters if they had been beneficially used without artificial diversion. Our holding in the case of *Adams* v. *Portage Irr., Reservoir & Power Co.*, 95 Utah 1, 72 P. 2d 648, suggests an answer to this question.

Another principle announced in the prevailing opinion which suggests a ruling contrary to our previously decided cases, and contrary to my understanding of hydrology, is that water is percolating water and part of the soil when close to the surface, but apparently loses this characteristic if it is found at depth. I had never supposed that proximity of water to the surface of the land altered the rights of the owner of the land, or resulted in changing waters from being appropriable to being unappropriable.

Prior to 1935 the Legislature had restricted the appropriation of public waters to those waters flowing in known or defined channels. Chapter 67, Section 1, Laws of Utah 1919, provided as follows:

"The water of all streams and other sources in this State, whether flowing above or under the ground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

This section was not amended until 1935. During that year, the Legislature passed the act which is now Section 100-1-1, U. C. A. 1943. This section is as follows:

"All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof."

An inspection of the two acts will disclose a definite legislative intent, as of 1935, to make all waters in this state available for appropriation regardless of whether they be classified as surface, underground, diffused, percolating, artesian, or otherwise. Under the provisions of this section, defendant Westwood would be entitled to appropriate the water here involved unless prior to 1935 plaintiff had acquired a right to the use thereof which could not be impaired by legislative change.

Under the stipulation of facts, there are two questions which I believe are involved in this litigation. The first touches on the classification of the water and the second

is whether or not plaintiff has beneficially used the water so as to be protected in her use.

As to the first question, I believe we should not longer try to make fine distinctions between classes of underground water. All water beneath the surface of the ground is, purely and simply, ground water moving according to certain well recognized laws of physics. In this particular case, very little, if any, of the water originates on plaintiff's land. Most of it must come from other places. It moves underground onto plaintiff's land and runs underground to other locations. The flow of the stream developed by the defendant indicates underground movement and flow. The water here involved is not stagnant and motionless, it is vagrant and meandering and to distinguish it from other underground waters is inconsistent with present day principles of ground water hydrology.

In addition to the foregoing reason, it is my opinion that under our present statute the classification of the water is immaterial for purposes of appropriation. However, it may be, as set forth by Mr. Justice Wade, of importance in determining the rights of plaintiff prior to the 1935 enactment. Generally speaking our previous cases have held that percolating or diffused waters are owned by the person who holds title to the land. If, therefore, this water could be classified as either percolating or diffused water, it could be reasonably argued that because of prior holdings of this court the plaintiff owned the water because it was part of the realty and passed with title to the land. I need not, in this action, decide whether this argument is sound, and, if so, whether the Legislature could, by a subsequent enactment, impair such a right. This for the reason that under the stipulated facts, these waters appear on the surface in a spring area and are concentrated rather than diffused. We have previously held that spring waters are subject to appropriation and while the surface flow in this area may have been small, it is sufficient to be treated by the parties as a spring.

My principal reason for dissenting, however, goes to the second proposition—namely, that plaintiffs have never beneficially used this water and that unless a beneficial use was established before 1935, the water became public property and subject to appropriation. While there has apparently been conflicting decisions in this state on the ownership of underground waters, I know of no decision which has held that either ownership or right to use could be established without the water having been put to beneficial use. Under the stipulated facts, the use in this case consists of using enough of the water to sustain the growth in the spring area of a few brushes, one or two patches of native grass, and one or two scrubby Cottonwood trees. Apparently the seepage from the course of the water was sufficient for this purpose as no efforts had been expended to contain the water in its natural channel or divert it from its normal path. Such use to me does not constitute a beneficial use. While the term "beneficial use" does not readily lend itself to a definition, I believe it can be said in this case that when underground water naturally sustains a small growth surrounding a spring, is not a use which can be termed beneficial, within the meaning of our statutes or our decisions. Had plaintiff ever attempted to use the water to improve the fertility of the soil, to grow grass or vegetation for meadow purposes, to use it for subterranean irrigation for products of the soil, or to use it for any other well recognized purpose, then I would believe plaintiff had acquired some rights. However, the record indicates that the water has been wasted, for the full period of time that the land has been owned by plaintiff. Underground water should be either beneficially used by the owner of the land or be available for appropriation by someone who will obtain some benefit from its presence in the area. To permit water to be wasted when it can be beneficially used is not in keeping with my concept of developing one of the most important natural resources of the state.

I concur in the holding that under the facts and circumstances of this case, the application to appropriate should

not have been denied because the development turned out to have been performed on plaintiff's land. This is not an action to enjoin defendant from trespassing on plaintiff's land, to restrain a continuing future trespass, or to recover compensation for damages already sustained. The action was instituted to reverse the State Engineer's order approving an application to appropriate. Even though a technical trespass was committed, the State Engineer was not precluded from making a determination that there were unappropriated waters at the source. This determination is not controlled by the manner in which the information is secured. Whether the defendant can proceed and further develop the water without the consent of plaintiff or without some other legal proceeding was not before the State Engineer and is not now before us. However, in view of the fact that the principle has been discussed, I merely suggest that in my opinion Section 100-3-19, U. C. A. 1943, is not the section which controls the rights of the defendant, Westwood. He is not seeking to make a survey to secure required information for the purpose of making a water filing, what he seeks is to develop water on plaintiff's land. If he can acquire a right to do this then it must be because of the provisions of Section 100-1-6, U. C. A. 1943, which permits condemnation of land for purposes of securing water if an adequate consideration is given therefor.