PROVO RIVER WATER USERS' ASSO-
CIATION, a Utah corporation, and the
United States of America, Plaintiffs
and Appellants,

v.

Robert L. MORGAN, State Engineer of
the State of Utah, and Kamas Hills
Ltd., a Utah limited partnership, Defen-
dants and Appellees.

No. 920069.

Supreme Court of Utah.

July 27, 1993.

Joseph Novak, Rodney R. Parker, Marc T. Wangsgard, Salt Lake City, for Provo River Water Users.

David Jordan, U.S. Atty., Stephen L. Roth, Asst. U.S. Atty., Salt Lake City, for U.S.

R. Paul Van Dam, Atty. Gen., Michael M. Quealy, John H. Mabey, Jr., Asst. Attys. Gen., Salt Lake City, for State Engineer.

Arthur H. Nielsen, Clark R. Nielsen, Salt Lake City, for Kamas Hills.

ZIMMERMAN, Justice:

This is an appeal from a district court order ruling that the 1937 Weber River Decree (the "decree") does not bar Kamas Hills Ltd. ("Kamas Hills") from asserting diligence claims to certain artesian springs. The springs are located in the Weber River drainage but have no surface connection with the Weber River or its surface tributaries. We affirm the trial court's order and hold that the decree did not adjudicate Kamas Hills' diligence claims and therefore poses no obstacle to their assertion now.

Because our decision turns on the scope of the decree, we begin our discussion of the facts by providing some background. The adjudication that led to the decree had its genesis in a 1921 lawsuit between Hooper Irrigation Company and North Ogden Irrigation Company. In February of 1921,

the companies jointly petitioned the District Court of the Second Judicial District to convert their case into a general adjudication of the Weber River system pursuant to the general adjudication statutes then in effect. 1919 Utah Laws ch. 67, §§ 20–40.[1] The court did so, and sixteen years later, it entered the decree. *Plain City Irr. Co. v. Hooper Irr. Co.*, Civil No. 7487 (June 2, 1937).[2]

The decree does not purport to adjudicate rights in all of the tributaries of the Weber River. According to the decree's terms, water rights on the Ogden River above its confluence with the Weber River and "rights upon tributaries or streams which flow into the Weber River System from the north side below said junction" are excluded from its scope. In addition to the water rights on the portion of the river and surface tributaries specified in the decree, the decree awards water rights in a number of "isolated springs," or springs that have no surface connection to the Weber River. The decree, tracking statutory language, declares that "all [subsequent] claims to the right to the use of water of [the Weber River] System are forever barred."[3] Central to our decision is the scope of the rights adjudicated by this decree. Did it include all water rights in the geographic area described? If not, what was covered?

We now turn to the facts of the instant case. In 1957, John I. Andrus, the predecessor in interest of Kamas Hills, filed two diligence claims[4] for water from certain isolated springs on his property in the Uintah Mountains, east of Marion and upslope of the Weber River. These springs, referred to here as the "Kamas Hills springs," are isolated artesian (or flowing) springs—they rise to the surface naturally, flow a short distance, and then percolate back into the ground. The entire flow of these springs takes place on Kamas Hills' property. At all pertinent times, the water has been used for irrigation and stock watering.

Sometime before 1988, Andrus conveyed his interest in the springs to City Creek Enterprises, the immediate predecessor in interest of Kamas Hills. In 1988, City Creek Enterprises filed a change application with the state engineer requesting a change in point of diversion and place and nature of use for the Kamas Hills springs. According to the change application, City Creek Enterprises proposed to use the water primarily to support 100 year-round residences and 176 occasional-use residences. The application also indicated that some water would be used for irrigation and stock watering.

The Provo River Water Users' Association ("PRWUA") and the Bureau of Recla-

1. The general adjudication statutes originally enacted in 1919 are virtually the same as the current versions. *Compare* 1919 Utah Laws ch. 67, §§ 20–40 *with* Utah Code Ann. §§ 73–4–1 to –24. *See generally* Robert W. Swenson, *A Primer of Utah Water Law: Part II*, 6 J. Energy L. & Pol'y 1, 29–35 (1985). The general adjudication process as it was conducted in the Weber River adjudication is discussed in *Smith v. District Court*, 69 Utah 493, 498–500, 256 P. 539, 541 (1927).

2. The record of the proceedings leading up to the trial court's issuance of the decree was lost by the Weber County court clerk. The only document available for review is the state engineer's proposed "Determination of Water Rights" for the Weber River system, which was completed in 1924.

3. Section 29, chapter 67 of the 1919 Laws of Utah states in pertinent part:
    The filing of each statement by a claimant shall be considered notice to all persons, cor-
porations and associations of the claim of the party making the same, and any person, corporation or association failing to make and deliver such statement of claim to the clerk of the court within the time prescribed by law shall be forever barred and estopped from subsequently asserting any rights and shall be held to have forfeited all rights to the use of said water theretofore claimed by him....
1919 Utah Laws ch. 67, § 29 (currently codified at Utah Code Ann. § 73–4–9).

4. A diligence claim is a claim to a water right established by putting water to beneficial use prior to March 12, 1903, when the statutes creating the mandatory appropriation application process went into effect. *See Eskelsen v. Town of Perry*, 819 P.2d 770, 771 n. 1 (Utah 1991). Once filed with the state engineer, a diligence claim is considered prima facie evidence of the claimant's water right. *See* Utah Code Ann. § 73–5–13.

mation protested the change application. PRWUA is a nonprofit corporation formed to repay the construction costs of a federal reclamation project that includes the Deer Creek Dam and Reservoir near Heber City. Most of the water captured by the project is used for municipal purposes in Salt Lake and Utah Counties. The project water rights, standing in the name of the United States (through the Bureau of Reclamation), include rights to divert water from the Weber River and deliver it into the Provo River through the trans-watershed Weber–Provo Diversion Canal. Because the priority dates of these water rights are relatively late compared to other water rights on the Weber River, they are essentially rights to the Weber River's surplus flows.

PRWUA and the Bureau of Reclamation protested the change application because they believed that the Kamas Hills springs share the same hydrologic system as the Weber River. The protestants apparently contended that the elimination of some of the return flows from the current use of the springs would reduce the overall quantity of water in the Weber River system. Because less surplus flow would be available, they claimed that the change would impair their vested rights. PRWUA further argued, ostensibly in the alternative, that the decree barred City Creek Enterprises from asserting the diligence claims originally filed by Andrus.

The state engineer rejected the protests and approved the change application on September 8, 1989. However, he ordered that the proposed residential use be reduced to 90 year-round and 105 occasional-use units. Similar reductions were ordered for irrigation and stock watering.

PRWUA timely filed an action in the Third Judicial District Court for a de novo review of the state engineer's decision. The complaint named City Creek Enterprises and the state engineer as defendants. Before trial, City Creek Enterprises conveyed its interest in the Kamas Hills springs to Kamas Hills Ltd., which took its place as co-defendant. The United States subsequently intervened as a co-plaintiff.

At trial, the parties agreed that there was no surface connection between the Kamas Hills springs and the Weber River. The court was thus faced with deciding whether the decree adjudicated water sources with a subsurface connection to the Weber River and whether, in fact, the Kamas Hills springs fed the Weber River underground. Although the trial court ultimately affirmed the state engineer's decision, the basis for its decision is unclear. The court's order does not state explicitly whether it found that the decree was intended to adjudicate all water right claims in the Weber River drainage area specified in the decree or just those for water sources with surface connections to the Weber River. The court did find that "the evidence is insufficient to establish that the waters from the [Kamas Hills springs] definitely make their way into the Weber River," apparently in reference to the possibility of a subsurface connection. However, the court's order is ambiguous as to whether this finding was the sole or an alternative basis for decision. PRWUA and the United States now appeal.

Before this court, the parties characterize the trial court's order as interpreting the decree to adjudicate only claims for waters with a surface connection to the Weber River and its tributaries. We construe the order according to this view. It is ambiguous on this point, and construing it as they contend does not result in a patently irrational order and is as logical as any other construction.

We address two of plaintiffs' arguments. First, we consider their argument that the trial court erroneously admitted parol evidence to interpret the decree because it purportedly had found the decree unambiguous on its face. Second, we address plaintiffs' contention that the trial court erred in interpreting the decree as not barring Kamas Hills' diligence claims.

■ We first examine plaintiffs' challenge to the trial court's admission of parol evidence. Over plaintiffs' objection, the trial court admitted evidence of the state engineer's normal practices and policies dur-

ing the Weber River adjudication process. The court also admitted evidence showing that hundreds of diligence claims had been filed for waters within the relevant portion of the Weber River drainage that were not recognized in the decree. Plaintiffs claim that this evidence should not have been admitted because the trial court expressly found that the language of the decree was unambiguous. They argue that admitting the evidence violated the rule that parol evidence is not admissible to interpret a water rights decree when that decree is unambiguous on its face. *See Meridian Ditch Co. v. Koosharem Irr. Co.*, 660 P.2d 217, 221 (Utah 1983); *cf. Logan, Hyde Park & Smithfield Canal Co. v. Logan City*, 72 Utah 221, 227, 269 P. 776, 778 (1928).

As an initial matter, we do not read the trial court's order as finding that the decree was unambiguous, at least with respect to the issue of whether it precluded Kamas Hills' diligence claims. The order states only that "the Weber River Decree is not ambiguous as far as it goes, but ... the Decree does not extend as far as the Plaintiffs' claims in this matter." We think this statement means simply that the decree is unambiguous as to the rights it explicitly adjudicates, viz., those tabulated in the decree.

Having reviewed the decree, we agree with the trial court's implicit conclusion that the decree *is* ambiguous as to whether it was intended to adjudicate the rights to all waters in that geographic portion of the Weber River drainage described in the decree, without regard to whether those waters are hydrologically connected to the Weber River underground or only by surface tributaries. For example, the decree states that it is adjudicating the interests of "all those entitled to the right to the use for any purpose of water from the Weber River System, other than the users *upon the Ogden River* above its junction with the Weber River and also other than those who have rights *upon tributaries or streams* which flow into the Weber River System from the north side below said junction." (Emphasis added.) Although

the use of the word "system" connotes the entire hydrologic system, the decree excludes only specific *surface* courses, rather than hydrological units, such as drainages, basins, or watersheds. This suggests that "system," as used here, may refer to the system of surface tributaries flowing into the Weber River.

In addition, the decree adjudicates rights from some isolated springs and seeps that apparently have no surface connection with the Weber River or its surface tributaries. This supports plaintiffs' assertion that the term "system" is used in its hydrologic sense, at least within the geographic limits specified in the decree. Yet, the decree does not adjudicate any rights to the use of groundwater accessed by wells. This undermines the argument that "system" refers to the drainage area.

We conclude that the trial court correctly found the decree to be ambiguous on its face with respect to the issue before us. Therefore, the trial court was entitled to "look to the background circumstances and ... consider extraneous evidence in determining what was intended by the adjudication of water rights." *Orderville Irr. Co. v. Glendale Irr. Co.*, 17 Utah 2d 282, 286, 409 P.2d 616, 619 (1965).

We now address the primary issue in this case: whether the trial court erred in interpreting the decree as not barring Kamas Hills' diligence claims. Because the trial court's interpretation of the decree is a question of law, we review the court's decision for correctness and afford it no particular deference. *See Blake v. Hansen*, 782 P.2d 472, 474 (Utah 1989). To the extent that we must rely on facts deduced from testimony, we defer to the trial court's relevant findings of fact, if any, by applying the clearly erroneous standard of review, *cf. State v. Thurman*, 846 P.2d 1256, 1270 n. 11 (Utah 1993), and resolve any ambiguities in the evidence in favor of the trial court's judgment, *State v. Ramirez*, 817 P.2d 774, 787 (Utah 1991).

Plaintiffs contend that we must interpret the decree as barring Kamas Hills' diligence claims because the decree itself, the history leading up to the decree, and the

purpose of the general adjudication statutes indicate that the Weber River adjudication was intended to settle all water rights in the hydrologic area specified in the decree. They concede that the Kamas Hills springs have no surface connection with the Weber River and its tributaries, but they claim that the evidence presented at trial proved a hydrological link between the springs and the Weber River.

Defendants argue that the history leading up to the decree and the case law existing during the adjudication demonstrate that the Weber River adjudication was intended to settle only those water rights in the Weber River and its surface tributaries. They contend that in 1921, when the adjudication commenced, case law held that isolated springs were considered the private property of the landowner-user. As a result, the court did not have jurisdiction to adjudicate the rights to isolated springs under the general adjudication statutes. Thus, they conclude, the existence of a hydrological link between the Kamas Hills springs and the Weber River is irrelevant.

■ We agree with defendants that the decree was intended primarily to adjudicate water rights to the Weber River and its surface tributaries.[5] We think it is unlikely that the court intended to adjudicate rights to all isolated springs in the relevant portion of the Weber River drainage area. This conclusion rests in part on the fact that the law did not require isolated spring users to assert their rights in a general adjudication for the first fourteen years of the Weber River proceeding. It was only two years before the decree was issued that the law changed so as to subject isolated spring users to the Water Code's regulatory provisions. Some explanation is in order.

Until 1935, isolated springs such as the Kamas Hills springs were considered "per-

colating waters." This legal classification included diffused groundwater (groundwater not flowing in known or defined channels) and seeps and artesian springs that did not flow off the property owner's land. *Riordan v. Westwood*, 115 Utah 215, 220–21, 203 P.2d 922, 925 (1949); see Robert W. Swenson, *A Primer of Utah Water Law: Part II*, 6 J. Energy L. & Pol'y 1, 21–22 n. 87 (1985) [hereinafter Swenson]. Our cases prior to 1921 uniformly viewed percolating waters as subject to the property owner's absolute control. *See Riordan*, 115 Utah at 219, 203 P.2d at 924 (collecting cases).

Between 1921 and 1935, the absolute control exercised over isolated springs by landowner-users was gradually whittled away by a series of opinions from this court. In October of 1921—nine months after the Second District Court was petitioned to initiate the Weber River adjudication—this court adopted the "correlative rights" or "reasonable use" doctrine and applied the beneficial use requirement to resolve a dispute over percolating waters between adjacent property owners in an artesian basin. *Horne v. Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815 (1921). This appears to be the first case recognizing that the use of percolating waters, specifically, isolated artesian wells,[6] was subject to judicial control beyond that imposed by traditional property and tort law. *See generally* Swenson at 21–22. In 1925, we appeared to apply another layer of judicial control to percolating waters by holding that the right to use certain isolated artesian springs could be forfeited through nonuse. *Deseret Live Stock Co. v. Hooppiania*, 66 Utah 25, 32, 239 P. 479, 481 (1925).

Finally, in 1935, this court virtually abandoned the distinction between percolating waters and other waters by holding that the use of isolated springs is governed by

---

**5.** We therefore do not reach plaintiffs' contention that the trial court erred in finding that the evidence was insufficient to establish a hydrological, subsurface link between the Kamas Hills springs and the Weber River.

**6.** Although *Horne* dealt with artesian wells (i.e., man-made), as opposed to artesian springs (i.e., naturally formed), the distinction apparently has no bearing on the pre–1935 definition of "percolating waters." *But see Fairfield Irr. Co. v. Carson*, 122 Utah 225, 247 P.2d 1004 (1952).

the appropriation statute.[7]  *Wrathall v. Johnson*, 86 Utah 50, 104–05, 40 P.2d 755, 779 (1935); *Justesen v. Olsen*, 86 Utah 158, 167, 40 P.2d 802, 806 (1935); *see Riordan*, 115 Utah at 224, 203 P.2d at 927.  Later that same year, the legislature ratified our view by amending the Water Code to recognize that all waters of the state, whether above or below the surface, are subject to the statutory appropriation and adjudication processes.  *See* 1935 Utah Laws ch. 105, § 100–1–1 (now codified at Utah Code Ann. § 73–1–1).

In the instant case, there is no clear indication in the decree to suggest that the court intended to bar the rights of all users of percolating waters who had failed to press their claims.  Indeed, we think it is obvious from the decree and the evidence presented at trial that the decree was not intended to adjudicate all rights in the relevant geographic portion of the Weber River watershed.  Perhaps most telling is the decree's lack of mention of any rights to groundwater accessed by wells.  If the court had intended to adjudicate all rights within the drainage area, it surely would have addressed groundwater rights.  There is little doubt that it was recognized in the 1920s and '30s that groundwater withdrawal could decrease the availability of water in surface courses.  The decree does adjudicate certain rights to waters diverted by "pump" and to "seepage water," but in all cases, the water appears to be collected from surface bodies.  The attorney for the Utah state engineer from 1936 to 1945,

Edwin J. Skeen, testified that virtually every other general adjudication commenced in Utah after 1936 explicitly included groundwater rights.  This suggests that the Weber River adjudication is unique, at least when compared to other general adjudications taking place after the Weber River Decree was issued.

In addition, Skeen, who was the only state attorney advising the state engineer at the time, testified that those involved in administering the Weber River adjudication viewed it as limited in scope.  He stated that during his association with that office, the state engineer considered the decree as covering only the Weber River, the tributaries named in the decree, and the seeps and springs immediately adjacent to the river.  Skeen further testified that in his capacity as counsel to the state engineer, he also considered the decree to cover only the river, its surface tributaries, and "the springs and surface tributaries from seeps immediately adjacent to the stream."

Based on the foregoing, we think that the decree was not intended to adjudicate the rights to isolated springs that are not expressly addressed in the decree.  Therefore, we hold that it cannot be interpreted to bar Kamas Hills' diligence claims to Kamas Hills springs.[8]

█ But even if we were to conclude that the decree was intended to adjudicate the rights to all isolated springs in the geographic area suggested by the decree, we would still hold that it does not bar

---

**7.**  1919 Utah Laws ch. 67, § 1 (now codified at Utah Code Ann. § 73–1–1).

**8.**  Notwithstanding the reasoning underlying our holding, we disagree with defendants' characterization of isolated springs prior to 1935 as "privately owned."  It is true that some of our pre–1935 decisions characterized diffused groundwater and isolated springs and seeps as subject to private ownership.  *Riordan*, 115 Utah at 219, 203 P.2d at 924 (collecting cases).  And in at least one of these cases, a finding of private ownership appears to have been the basis for decision.  *Id.* at 226, 203 P.2d at 928 (citing *Willow Creek Irr. Co. v. Michaelson*, 21 Utah 248, 60 P. 943 (1900)).  However, we agree with Chief Justice Wolfe's statement, made in 1952, that the public ownership of all water in the state

must have always been so.  The State through the Legislature progressively extended to various categories of water, procedures for acquiring use rights and general regulations to [be applied to] these categories.... But the fact that the State progressively applied regulation to the acquisition of use rights in water does not disturb the fundamental principle that all water ... at least from the time it reaches land within the confines of this state belongs to the public—the people of this state. *McNaughton v. Eaton*, 121 Utah 394, 405, 242 P.2d 570, 575 (1952) (Wolfe, C.J., concurring) (emphasis added); *accord Riordan*, 115 Utah at 222, 203 P.2d at 926; *see also J.J.N.P. Co. v. State*, 655 P.2d 1133, 1136 (Utah 1982); *Eden Irr. Co. v. District Court*, 61 Utah 103, 113–14, 211 P. 957, 961 (1922).

Kamas Hills' diligence claims. We do not know whether any of the water users in the Weber River drainage were ever apprised after the commencement of the general adjudication that the changes in Utah law in the years that followed would have an effect upon the adjudication underway and that those changes in the law would be reflected in the final decree. The record of the proceedings leading up to decree is not before us.[9] It is true that the decree itself indicates that water users in the area were directly and indirectly notified of the pending adjudication at various times in the sixteen years between commencement and issuance of the decree. The decree states, for example, that notice of the adjudication was published once a week for two weeks in area newspapers in 1923. However, we cannot assume that isolated spring users who were first notified of the adjudication when the law did not require them to come forward were later notified that the law had changed to require them to assert their rights or lose them. Under these circumstances, we think it would be unfair to interpret the decree according to the law that existed at the time it was issued.[10]

In fact, due process may require us to reach this conclusion. A fundamental requirement of due process, as mandated by the Fourteenth Amendment to the United States Constitution, is that notice be given that "is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *accord Carlson v. Bos*, 740 P.2d 1269, 1275 (Utah 1987); *see also* 2 *Waters and Water Rights* § 15.02(b), at 218–19 (Robert E. Beck ed. 1991). In the instant case, nothing in the record indicates that there was sufficient notice to apprise interested parties that the Weber River adjudication would include all isolated springs within the Weber River drainage and thus allow them to present their claims to such waters. Although the record suggests that Andrus was notified of the adjudication in general, we cannot determine whether he was notified that the adjudication would cover isolated springs.

The foregoing disposes of plaintiffs' res judicata argument. Plaintiffs assert that Andrus, Kamas Hills' predecessor in interest, was a party to the decree in that he was awarded a water right for Hoyt Spring, approximately one mile north of the Kamas Hills springs.[11] Therefore, they argue, res judicata bars Kamas Hills from asserting any claims that its predecessor in interest should have made. Even assuming that the Andrus named in the decree is Kamas Hills' predecessor, res judicata does not come into play because there is no indication that sufficient notice was given to apprise Andrus that the adjudication would affect his claim to the Kamas Hills springs.[12] Therefore, we cannot say that he had a "fair opportunity" to litigate the issue. *See Jacobsen v. Jacobsen*, 703 P.2d 303, 305 (Utah 1985) (citing *Mendenhall v. Kingston*, 610 P.2d 1287, 1289 (Utah 1980)).

Plaintiffs argue that we must construe the decree expansively to effectuate the purpose of general adjudication, which,

---

9. *See supra* note 2.

10. We do not intend to announce a rule requiring that a trial court fix the law at the point of commencement in a general adjudication. If sufficient notice of a change in the law is provided to the affected water users to allow them to take appropriate action to protect their rights, it would seem reasonable that the new law should be applied. *Cf.* Utah Code Ann. § 73–4–21 (stating that once notice of the proceedings is duly given, "it shall be the duty of every person served to thereafter follow all court proceedings and no further or additional notice shall be required"). However, that is a question for another day.

11. Andrus is also listed in the state engineer's 1924 tabulation of water rights as a person who either filed a disclaimer or made no claim to "any of the waters of the Weber River or its tributaries."

12. The fact that Andrus was awarded a right for Hoyt Spring is not inconsistent with his apparent decision not to seek adjudication of his rights to the Kamas Hills springs. Evidence was presented at trial suggesting that Hoyt Spring intermittently flows in surface channels to a tributary of the Weber River.

they say, is to settle all claims "tributary"—whether on the surface or underground—to the river system. Plaintiffs claim that "[i]t defies logic to assert that all rights of a river system can be settled by excluding springs."

This conceptual view of general adjudication is correct. As recognized by Professor Swenson, the basic goal of general adjudication "is to record all water claims from a particular source which subsequent appropriators can rely upon before making their investments." Swenson at 29; *accord Smith v. District Court*, 69 Utah 493, 498, 256 P. 539, 541 (1927) (noting that two purposes of general adjudication are to prevent piecemeal litigation and to make a permanent record of existing rights). Accordingly, "the judgment arrived at must have some degree of finality and solidarity," *Green River Adjudication v. United States*, 17 Utah 2d 50, 52, 404 P.2d 251, 252 (1965), and collateral attacks should be discouraged, *see* Swenson at 34.

However, in the instant case, the policy favoring comprehensive adjudications simply does not carry as much weight as it ordinarily might. The decree expressly excludes certain tributaries that feed the adjudicated system and does not adjudicate any rights to groundwater accessed by wells. Under these circumstances, we are not persuaded that the policy favoring comprehensive adjudications should alter how we otherwise interpret the decree.

Plaintiffs also attempt to buttress their position by pointing out that the decree did in fact award rights to certain isolated springs similar to the Kamas Hills springs. Defendants acknowledge that the decree adjudicates some rights to isolated springs. However, they argue that because the law was unsettled during the adjudication, the filing of claims and the subsequent award of rights to some isolated springs were simply the result of the actions of overcautious landowners and were ultimately unnecessary.

We agree that the decree's recognition of water rights to isolated springs was unnecessary, but we are unwilling to speculate why the claimants pressed their adjudication. Although it is reasonable to assume that some users of isolated springs may have petitioned the court because they were uncertain about the status of the law, the record before us simply provides no support one way or another.[13] It is enough to recognize that these landowner-users were under no obligation to assert their claims in the Weber River adjudication.

In sum, we hold that the Weber River Decree cannot be construed to adjudicate Kamas Hills' diligence claims. We therefore affirm.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.

---

**13.** It also may be that some of the isolated springs at that time were connected by surface flow, perhaps intermittently, to the Weber River and its tributaries. Again, the record allows nothing more than mere speculation.